**Laurel Knuckles SEATON, Plaintiff,**

**v.**

**Kenneth Marshall SEATON, Defendant.**

No. 3:96–cv–741.

United States District Court,
E.D. Tennessee,
at Knoxville.

July 1, 1997.

Melvin J. Werner, Werner and Associates, Kingsport, TN, for plaintiff.

Perry P. Paine, Jr., Paine, Garrett & Bray, Maryville, TN, for defendant.

### MEMORANDUM OPINION

JARVIS, Chief Judge.

This is an action for damages brought pursuant to the Violence Against Women Act (VAWA), 42 U.S.C. § 13981. Included in plaintiff's complaint are various pendent state law claims brought pursuant to this court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. Currently pending is defendant's motion to dismiss or, in the alternative, for summary judgment, [Doc. No. 3] on the ground that VAWA is an unconstitutional extension of Congress' powers under both the Commerce Cause of Art. I, Sec. 8, Cl. 3 of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Defendant further moves to dismiss the pendent state law claims on the grounds that they are barred by the one-year Tennessee statute of limitations, Tenn.Code Ann. § 28–3–104; that they raise novel or complex issues of law and should be dismissed pursuant to 28 U.S.C. § 1367(c)(1); and that there are other compelling reasons for denying, supplemental jurisdiction, 28 U.S.C. § 1367(c)(4). For the reasons that follow, the motion will be denied as to the federal claim and granted as to the supplemental state law claims.

I.

*Factual Background*

Plaintiff Laurel Knuckles Seaton and defendant Kenneth Marshall Seaton were married on February 14, 1992. Plaintiff alleges that, during the courtship prior to the marriage and throughout the marriage, defendant engaged in controlling, deceitful and abusive behavior, of which plaintiff was the victim. Plaintiff alleges that she was the victim of conspiracy, fraud, physical and sexual abuse, and emotional suffering.

On August 23, 1995, plaintiff filed for divorce from defendant after an alleged final altercation occurring on August 22, 1995. Plaintiff alleges that during the altercation, defendant severely threatened and assaulted her. Plaintiff's divorce complaint was filed in the Fourth Circuit Court for Knox County, Tennessee. In her divorce complaint, plaintiff asked for a divorce as well as civil damages resulting from defendant's alleged tortious conduct toward plaintiff. The charges in the state complaint include assault and battery, outrageous conduct, fraud, civil conspiracy, and defamation.

On August 22, 1996, plaintiff filed the instant action, in which she sets forth a primary federal claim that defendant, by his aforementioned actions, violated VAWA (Count I). The complaint also alleges related state law claims, including assault and battery (Count II), intentional infliction of emotional distress (Count III), false imprisonment (Count IV), breach of fiduciary duty (Count V), fraud and conversion (Count VI), and misrepresentation (Count VII). The complaint seeks injunctive relief, incidental and compensatory damages, exemplary and punitive damages, attorney fees and costs, and other equitable relief, including rescission.

Defendant, through his answer, denies all allegations of abuse, fraud, conspiracy, or otherwise. Additionally, defendant asserts in his dispositive motion that VAWA is unconstitutional as Congress exceeded its authority under either the Commerce Clause or the Equal Protection Clause. As such, defen-

dant contends that, as to Count I of plaintiff's complaint seeking relief under VAWA, plaintiff has failed to state a claim upon which relief can be granted and that there is no federal jurisdiction over defendant or the subject matter of plaintiff's federal claim.

As to the state claims, defendant asserts that they should be dismissed under the provisions of 28 U.S.C. § 1367. Defendant argues that the state claims raise novel or complex issues of law, substantially predominate over the claim made under VAWA, and invoke circumstances providing other compelling reasons for declining jurisdiction—namely that many, if not all, of the same claims are pending in a divorce suit between the parties in state court.

Finally, defendant asserts that, with the exception of the final altercation, all of the actions alleged by plaintiff occurred over one year before the filing of the original federal complaint and are, therefore, barred by the Tennessee statute of limitations for civil actions.

## II.

### Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper if there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The facts and all reasonable inferences to be drawn therefrom are viewed in a light most favorable to the non-moving party in determining if a genuine issue of material fact exists. *See Oakland Gin Co. v. Marlow (In re The Julien Co.)*, 44 F.3d 426, 429 (6th Cir.1995); *Kunz v. United Food & Commercial Workers, Local 876*, 5 F.3d 1006, 1008–09 (6th Cir.1993). The moving party bears the burden of showing an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339,

1347 (6th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

However, once the moving party has met its initial burden, the non-moving party must present significant probative evidence in support of the complaint to defeat the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The standard is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12). The non-moving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. And if the non-moving party fails to make a sufficient showing to establish any element essential to her claim on which she bears the burden of proof, the non-moving party is entitled to summary judgment. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993).

## III.

### VAWA

Defendant contends that, by enacting VAWA, Congress exceeded its powers under the Commerce Clause, which gives Congress the power to "regulate Commerce with Foreign Nations and among the several states...."[1]

Before beginning an analysis of VAWA's constitutionality under the Commerce Clause, the court must note its extreme discomfort with the sweeping nature of VAWA. While there is no doubt that violence against women is a serious matter in our society, this particular remedy created by Congress, because of its extreme overbreadth, opens the doors of the federal courts to parties seeking leverage in settlements rather than true justice. The framers of the Constitution did not

---

1. Defendant also argues that Congress exceeded its powers under the Equal Protection Clause of the Fourteenth Amendment. As the court finds VAWA to be constitutional under the Commerce Clause, this argument is moot and need not be addressed herein. The court must note for the record, however, the overwhelming evidence of gender-based violence adduced by the congressional committees that analyzed this problem. This evidence clearly established a compelling legislative interest in addressing such a widespread problem.

intend for the federal courts to play host to domestic disputes and invade the well-established authority of the sovereign states. Nevertheless, the court must heed the well-settled precedent extant in Commerce Clause jurisprudence in an effort to determine whether VAWA, even in view of its sweeping nature, passes muster under the Commerce Clause.

A. The Commerce Clause.

The power of Congress under the Commerce Clause was first defined in *Gibbons v. Ogden,* which established Congress' power to directly regulate interstate commerce; *Gibbons* allowed Congress' commerce power to spread beyond mere trafficking of goods across state lines and into the realm of "commercial intercourse." 9 Wheat. (22 U.S.) 1, 189–190, 6 L.Ed. 23 (1824). The Supreme Court in *Gibbons* further noted that this power "acknowledges no limitations, other than are prescribed in the Constitution." *Id.* at 196.

In 1937, the Supreme Court developed a standard that gave Congress the power to regulate intrastate activities which "have such a close and *substantial relation to interstate commerce* that their control is essential or appropriate to protect that commerce from burdens and obstructions." *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937) (emphasis added). Further, in determining whether Congress has acted within its limits, "the task of the court ... is relatively narrow." *Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1980). The court's standard of review is limited to whether a "rational basis" existed for Congress to conclude that a regulated activity sufficiently affected interstate commerce. If a rational basis is found for the statute under the Commerce Clause, the court must then consider whether the means chosen by Congress are "reasonably adapted to the end permitted by the Constitution." *Id.*

B. The *Lopez* Interpretation.

For decades following the *Jones and Laughlin Steel* case, Congress enjoyed the unbridled power to regulate any activity that remotely affected interstate commerce. However, in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court found, for the first time in 50 years, that Congress had exceeded its power under the Commerce Clause and that a federal statute was therefore invalid. The statute in question was the Gun–Free School Zones Act, 18 U.S.C. § 922(q)(1)(A), which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." *Id.*

Significantly, in affirming the Fifth Circuit Court of Appeals' finding that the Act was unconstitutional, the Supreme Court noted that it would continue to apply the rational basis test pursuant to *Hodel* to determine if the statute passed constitutional muster. *Lopez,* 514 U.S. at 557–59, 115 S.Ct. at 1629. The Court first identified three categories of activity that Congress may properly regulate under the Commerce Clause. First, the use of the channels of interstate commerce is clearly within the powers of Congress to regulate. Second, the "instrumentalities of interstate commerce" may constitutionally be regulated. Third, it is within Congress' power to regulate those activities having a substantial relation to interstate commerce, or those activities that substantially affect interstate commerce. *Lopez,* 514 U.S. at 557–61, 115 S.Ct. at 1629–30.

The *Lopez* Court stated that, if the Gun–Free School Zones Act was to be upheld at all, it had to pass muster under the third category as a regulation of an activity that substantially affects interstate commerce. However, the court found that the Act, as it was basically criminal in nature, had nothing to do with commerce or any economic enterprise "however broadly one might define those terms." *Id.* at 561, 115 S.Ct. at 1631. As the Gun–Free School Zones Act did not fit into any of the three categories, it was found unconstitutional as beyond Congress' commerce power. *Id.* at 561–63, 115 S.Ct. at 1631.

Significantly, the *Lopez* court noted that there was no evidence establishing a rational basis for determining that the possession of a

firearm within a school zone may affect interstate commerce. Indeed, the Act was not precipitated by *any* legislative investigation into the effects the regulated activity may have on interstate commerce. *Id.* While the court acknowledged that Congress was not required to make legislative findings into the effects of the regulated activity, it nonetheless noted that, had Congress done so, it may have contributed to the Court's ability "to decide whether a rational basis existed" for Congress' determination that the activity in question would substantially affect interstate commerce, "even though no such substantial effect was visible to the naked eye." *Id.* at 563, 115 S.Ct. at 1632. In the absence of any such findings, the court concluded that, in order to find a rational basis, it would have to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce clause to a general police power of the sorts retained by the states." *Id.* at 567, 115 S.Ct. at 1634. Hence, the Court held that Congress exceeded its powers under the Commerce Clause and the Act was thus invalid.

### C. *Lopez* and VAWA.

██ Like the Gun–Free School Zones Act, VAWA is clearly not economic on the surface. Thus, if VAWA is to be found constitutional, it must also be considered within the third category of congressional powers set forth in *Lopez* as it does not affect the channels or instrumentalities of interstate commerce.

Although VAWA is not a criminal statute, it is substantially similar to the Act in question in *Lopez* in that it is essentially based on criminal activity, namely gender-based violent crime. While a few courts have been hesitant to recognize commerce effects in a criminal statute, *see, e.g., United States v. Pappadopoulos,* 64 F.3d 522, 526 (9th Cir. 1995), and *United States v. Mussari,* 894 F.Supp. 1360, 1363–64 (D.Ariz.1995), there have been numerous post-*Lopez* decisions by federal courts upholding both criminal and civil enactments as constitutional. These enactments include gambling, *see United States v. Wall,* 92 F.3d 1444 (6th Cir.1996); carjacking, *see United States v. Soderna,* 82 F.3d

1370 (7th Cir.1996), and *United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.1996); possession of a firearm by a felon (a subsection of the same statute that included the Gun–Free School Zones Act), *see United States v. Chesney,* 86 F.3d 564 (6th Cir.1996); intrastate possession and/or sale of narcotics, *see United States v. Genao,* 79 F.3d 1333 (2d Cir.1996); and numerous others.

Moreover, even though it does not regulate commercial activity *per se,* VAWA, unlike the Act in *Lopez,* contains extensive congressional findings into the impact of violence on interstate commerce. Congress compiled substantial documentation on this subject through numerous hearings conducted over a four-year period prior to enacting VAWA. Thus, although "to the naked eye" there may be no clear rationale for Congress to conclude that violence against women substantially affects interstate commerce, these congressional findings may offer a basis to evaluate Congress' judgment.

Congress first cited a plethora of shocking statistics into the frequency and extent of gender-based violence. *See, generally,* Senate Rep. No. 103–138, Violence Against Women Act of 1993, 37 (1993); H.R.Rep. No. 103–95, Violence Against Women Act of 1993, 26 (1993). Congress also found, among other things, "that gender-based crimes and fear of gender-based crimes restrict movement, reduce employment opportunities, increase health expenditures, and reduce consumer expending, all of which affect interstate commerce and the national economy." S.Rep. No. 138, at 54. Further, Congress noted that "[s]tudies report that almost 50% of rape victims lose their jobs or are forced to quit in the aftermath of the crime." *Id.* A House Conference stated that "crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting business ... in interstate commerce...." H.Rep. No. 103–711, Violent Crime Control in Law Enforcement Act of 1994, 385 (1994).

To be certain, then, gender-based violence has at least some effect on interstate commerce. Indeed, there may, in fact, be a

substantial effect, regardless of the statute's reliance on criminal, rather than strictly commercial, activity. The question that remains, however, is whether the legislative findings provide a rational basis for concluding that gender-based violence has a substantial effect on interstate commerce.

■ Clearly, just because Congress says that an activity affects interstate commerce does not make it so. *See Hodel,* 452 U.S. at 311, 101 S.Ct. at 2391–92. Further, "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional powers of Congress to regulate them is ultimately a judicial rather than a legislative question." *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258 (1964). However, as previously stated, the court is limited to the rational basis test. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360.

Two district courts have come to opposite conclusions when applying the *Lopez* ruling to VAWA in light of the congressional findings set out above. In *Doe v. Doe,* 929 F.Supp. 608 (D.Conn.1996), the district court upheld the constitutionality of VAWA. The *Doe* court distinguished *Lopez* by stating that the rationale of Congress under the Gun–Free School Zones Act could only be inferred through theoretical impact arguments. *Doe,* at 613. By contrast, VAWA was enacted after four years of extensive investigation and compilation of data finding substantial effects of gender-based violence on interstate commerce. *Id.*

The *Doe* court concluded that, since *Lopez* did not overturn or limit the rationality test under *Hodel,* the numerous hearings and substantial documentation amassed by Congress evinced a rational basis for finding that gender-based violence sufficiently affected interstate commerce. *Id.* at 613. Thus, even though VAWA is predicated on criminal activity and is not clearly commercial on the surface, there was a clear rational basis for Congress' actions, making the Act valid under the Commerce Clause. *Id.*

In the opposite corner, in *Brzonkala v. Virginia Polytechnic & State Univ.,* 935 F.Supp. 779 (W.D.Va.1996), the district court, without citing the *Doe* case, found VAWA to be unconstitutional. The court noted that congressional findings were not "necessary" under *Lopez,* and concluded that the absence of such findings in *Lopez* was incidental to that Court's decision. Thus, the *Brzonkala* court held that, regardless of the extensive congressional findings related to VAWA, it was up to the court to determine, based on the circumstances and common sense, whether Congress had a rational basis for concluding that gender-based violence substantially affects interstate commerce. *Id.* at 789–90.

The court ruled that gender-based violence, although it may affect "the national economy," does not substantially affect "interstate commerce." *Id.* at 792–93. Further, "[u]ndoubtedly, effects on the national economy affect interstate commerce. Such a chain of causation alone, however, is insufficient to bring an act within the purview of the commerce power." *Id.* The *Brzonkala* court ultimately concluded that a ruling otherwise would offer an unrestricted general police power to the federal government, as family law issues and most criminal issues also affect the national economy and would be subject to federal regulation, even though they are traditionally regulated by the states' police powers. *Id.*

This court is quite reluctantly inclined to agree with the *Doe* court and finds that Congress had a rational basis for determining that violence against women sufficiently affects interstate commerce. The Sixth Circuit Court of Appeals, in *Wall,* 92 F.3d 1444, recently examined the constitutionality of a federal statute under the Commerce Clause. *Wall* involved a violation of 18 U.S.C. § 1955, which criminalizes illegal gambling operations of a certain nature and size. The Sixth Circuit found that the statute was constitutionally grounded under the Commerce Clause, due to substantial congressional findings analyzing the effect of illegal gambling on interstate commerce. 92 F.3d at 1450–52. The court further noted that "most courts have resisted urgings to extend *Lopez* beyond § 922(q) [the Gun–Free School Zones Act]." *Id.* In doing so, the court pointed to several post-*Lopez* decisions upholding Congress' use of the Commerce Clause, including *Doe v. Doe,* which upheld VAWA. *Id.,* 92

F.3d at 1447–49. Thus, the Sixth Circuit has, at least implicitly, given its imprimatur to the result reached in *Doe*. It was the Sixth Circuit's contention that "until the Supreme Court provides a clearer signal or cogent framework to handle this type of legislation, this court is content to heed the concurrence of two Justices that the history of Commercial Clause jurisprudence still 'counsels great restraint.'" *Id.*, 92 F.3d at 1452 (citing *Lopez*, 514 U.S. at 567–69, 115 S.Ct. at 1634 (Kennedy, J., concurring)).

Unfortunately, in this court's view, the *Brzonkala* court adopted a far too restrictive view of *Lopez*. Indeed, the notion that gender-based violence affects the national economy and not interstate commerce does not comport with the weight of authority applying the Commerce Clause. *Cf. Katzenbach v. McClung*, 379 U.S. 294, 303, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964) (The refusal of restaurants to serve African–Americans "imposed burdens both on the interstate flow of food and upon the movement of goods in general."); *Wickard v. Filburn*, 317 U.S. 111, 128, 129, 63 S.Ct. 82, 90–91, 91, 87 L.Ed. 122 (1942) (When a farmer grows wheat for personal consumption above his allotment prescribed by federal regulations, there is an effect on interstate commerce, due to the effects on the market). Likewise, when one-half of the nation's population is potentially limited in employment, traveling, and participation in commercial spending due to the threat of violence, interstate commerce and the national economy are inevitably affected. In addition, although the same activities may affect interstate commerce and the national economy (if they are indeed separable), the focus of Congress in its legislative findings was on interstate commerce and not the national economy.

While it is true that affording undue or excessive weight to the existence of legislative findings may create an opportunity for Congress to conduct hearings and compile information merely to exhibit some rational basis for a statute, this is an unlikely scenario, so long as the courts exercise reasonableness in their analysis of legislative findings. Here, it is unlikely Congress would spend four years determining the effects of gender-based violence on interstate commerce for the sole purpose of overcoming the rationality test and the Supreme Court's decision in *Lopez*, especially since *Lopez* was decided after the congressional hearings and findings began being made. Therefore, it is apparent that, along with the circumstances surrounding the problem of gender-based violence, the legislative findings suffice under the rational basis test to place VAWA within the rubric of the Commerce Clause.

### D. A Reasonable Means to an End.

Having found that Congress had a rational basis for determining that gender-based violence significantly affects interstate commerce, the question before the court turns to whether VAWA is a reasonably adapted means to the intended goal of Congress. *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360. While VAWA ostensibly seeks to protect the rights of women who are victims of gender-based violence, this court must again express its deep concern that the Act will effectively allow domestic relations litigation to permeate the federal courts. Issues related to domestic relations are better suited for the state courts, which have a closer relation to the concerns of their citizenry and are capable of applying state laws better suited for the needs of a particular area. Certainly Congress could have fashioned VAWA to exclude domestic relations, but such considerations are not appropriately within this court's purview. Rather the court's consideration is limited to whether Congress' actions were a reasonable means to a constitutionally permitted end, rather than whether Congress could have drafted a better law, as the court is convinced was possible.

Congress based its findings of a need for VAWA in part on the result of the states' self-assessments of the deficiencies in their judicial systems involving injurious gender-based conduct. H.Rep. 711, at 385; S.Rep. 138, at 49. Concluding that the states did not offer adequate protection from gender-based crimes, Congress was hardly unreasonable in creating a civil rights remedy to correct such deficiencies. The same course was followed in efforts to correct other pressing social ills such as racial discrimination.

*See, e.g., Katzenbach,* 379 U.S. 294, 85 S.Ct. 377. Thus, while this court may disagree with the inclusiveness of VAWA, the Act itself is not an unreasonable means to the ends intended by Congress.

## IV.

### State Claims

A. Statute of Limitations.

Defendant contends that the state actions asserted by plaintiff must be dismissed on the ground that they are barred by the one-year statute of limitations set forth in Tenn. Code Ann. § 28–3–104. Plaintiff's original complaint was filed with this court on August 22, 1996, one year to the day from the last of many alleged altercations between the parties.

The one-year statute of limitations for tort actions in Tennessee applies to "[a]ctions for libel, for injuries to the person, [and] false imprisonment...." Tenn.Code Ann. § 28–3–104. Thus, plaintiff's claims for assault, battery, and false imprisonment must be dismissed as time-barred, with the exception of any allegations included regarding the final altercation between the parties. This alleged final assault occurred within one day of the expiration of the limitations period. All allegations of assault, battery, or intentional infliction of emotional distress occurring prior to that date are beyond the statute of limitations and, consequently, must be dismissed.

■ In an effort to circumvent the limitations bar, plaintiff asserts that defendant's repeated and prolonged acts of assault and emotional distress constitute a continuing tort, thus tolling the statute of limitations. In addition, plaintiff argues that she was suffering from a disability by reason of mental or physical infirmity, thereby tolling the statute of limitations pursuant to Tenn.Code Ann. § 28–1–106, which tolls the limitations period for up to three years for persons who are "of unsound mind."

■ Both of these arguments must fail. First, the doctrine of continuing tort states that, in a tort arising from continuous conduct, a cause of action does not accrue until the conduct is abated. *See Tennessee East-*

*man Corp. v. Newman,* 22 Tenn.App. 270, 121 S.W.2d 130 (1938). The State of Tennessee, however, has never applied this doctrine to an action for assault. In fact the Tennessee courts have typically applied the doctrine only in cases of malpractice, *see Frazor v. Osborne,* 57 Tenn.App. 10, 414 S.W.2d 118 (1966); nuisance, *see Robertson v. Cincinnati, New Orleans & Texas Pacific Ry. Co.,* 207 Tenn. 272, 339 S.W.2d 6 (1960); contracts, *see Benco Plastics, Inc. v. Westinghouse Elec. Corp.,* 387 F.Supp. 772 (E.D.Tenn. 1974); employer-employee work environment, *see Goodall Co. v. Sartin,* 141 F.2d 427 (6th Cir.1944); and conspiracy, *see Emerson v. Machamer,* 221 Tenn. 739, 431 S.W.2d 283 (1968).

Further, the Tennessee Court of Appeals in *Housh v. Morris,* 818 S.W.2d 39, 43 (Tenn. Ct.App.1991), stated its reluctance to apply the doctrine in light of the state's adoption of the discovery rule. The discovery rule sets the statute of limitations for a tort action at one year from the date of the discovery of a cause of action. *Id.* The discovery rule is codified by Tenn.Code Ann. § 29–26–116. As a result, this court is reticent to apply the doctrine of continuing tort to areas of law beyond those to which it has been previously applied by the courts of Tennessee, especially where, as here, the alleged torts are of a clearly separate or discrete nature.

■ Second, plaintiff's argument that she was of unsound mind must also fail. Plaintiff alleges that she was of unsound mind during all times relevant in the complaint. Again, plaintiff is presumably seeking to invoke the protection of Tenn.Code Ann. § 28–1–106. According to plaintiff's psychological evaluation of April 18, 1995, she suffered from "Major Depression, severe, with psychotic symptoms." However, while the evaluation alludes to plaintiff's mental health, it in no way states that she was so incompetent as to be unaware of the injuries she allegedly sustained through her husband's actions.

Furthermore, there are no other evaluations of plaintiff prior to August 22, 1995, the date of the final altercation. As such, there is simply no evidence that plaintiff was of unsound mind as of the date her cause of action must have accrued. Because Tenn.

Code Ann. § 28–1–108 states that "[n]o person can avail himself of a disability unless it existed when his right of action accrued . . .," any evaluations after August 22, 1995, are irrelevant.

### B. Supplemental Jurisdiction

 Even assuming plaintiff could survive the statute of limitations bar, all of her state claims must be dismissed under 28 U.S.C. § 1367. This statute gives the federal courts supplemental jurisdiction over state claims that are so related as to "form part of the same case or controversy." *Id.* This jurisdiction, however, is discretionary under certain circumstances and is not of plaintiff's right. Specifically, § 1367(c) states that:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all of the claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, *there are other compelling reasons for declining jurisdiction.*

(Emphasis added).

The doctrine of continuing tort previously discussed certainly presents a rather novel and complex issue of state law. And since all of the personal injury torts have previously been asserted in the state court action, this court must decline to exercise supplemental jurisdiction over any claims that may exceed the applicable statute of limitations. Significantly, plaintiff will not lose these claims, since they are already pending in state court. This includes all allegations of assault, battery, false imprisonment, and intentional infliction of emotional distress that occurred prior to the final altercation.

Likewise, to the extent these torts were committed during the final altercation, they should nonetheless be dismissed, since they are, again, mirrored in the state court action. "It would serve neither the interests of judicial economy nor fundamental fairness to require [defendant] to defend itself simultaneously in two different courts on the same claims." *Lewis v. United States,* 812 F.Supp. 620, 625 (E.D.Va.1993). As such, the court finds this to be another "compelling reason" [for declining jurisdiction] and must decline to exercise supplemental jurisdiction over any of these pendent state law claims.

This court must also refuse to exercise supplemental jurisdiction with respect to the remaining state claims of breach of fiduciary duty, fraud and conversion, and misrepresentation. These claims seem to be no more than an artful guise for presenting matters of alimony and divorce settlement to the federal court for adjudication. The Sixth Circuit has adamantly refrained from exercising jurisdiction over "matters concerning 'the subject of divorce, or for the allowance of alimony.'" *Drewes v. Ilnicki,* 863 F.2d 469, 471 (6th Cir.1988). The Sixth Circuit has also stated that "[i]t is incumbent upon the district court to sift through the claims of the complaint to determine the true character of the dispute to be adjudicated." *Firestone v. Cleveland Trust Co.,* 654 F.2d 1212, 1216 (6th Cir.1981).

 Even though the court is of the opinion that VAWA is constitutional, this court will not allow the Act to become a gateway for domestic relations issues to slip into this federal court. VAWA itself states that the statute does not "confer on the courts of the United States jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody." 42 U.S.C. § 13981(e)(4). Applying the Sixth Circuit's mandate for district courts to interpret the true meaning of a dispute, this court finds that the true character of the dispute in the present case is the division of marital assets, at least insofar as the state law claims regarding breach of fiduciary duty and the like are concerned. Plaintiff merely seeks to tip the equitable scales of distribution in her favor using the federal court as leverage. This is a matter to be resolved by the state courts within the divorce proceeding and must not be imported into the federal courts.

## V.

### *Conclusion*

Therefore, for the foregoing reasons, defendant's motion to dismiss or, in the alternative, for summary judgment will be denied with respect to VAWA and granted with respect to all pendent state law claims.

Order accordingly.