Oxana ANISIMOV, Plaintiff,

v.

Jacob S. LAKE, D.D.S., and
Jacob S. LAKE, D.D.S.,
LTD, Defendants.

No. 97 C 263.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 26, 1997.

Ronald L. Futterman, Laurie Arden Wardell, Futterman & Howard, Chtd., Chicago, IL, for Plaintiff.

Tod Michael Urban, Law Office of Tod M. Urban, Chicago, IL, for Defendants.

Thomas P. Walsh, U.S. Atty's Office, Chicago, IL, John R. Tyler, Patricia Leitner, U.S. Dept. of Justice, Washington, DC, for Intervenor U.S.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff Oxana Anisimov ("Anisimov") filed this action against Defendants Jacob S. Lake, D.D.S. and Jacob S. Lake, D.D.S., LTD. (collectively "Lake") seeking damages under the Violence Against Women Act of 1994 ("VAWA"), 42 U.S.C. § 13981, and various state common law tort claims for injuries allegedly sustained when Lake "engaged in crimes of violence motivated by gender" against Anisimov. This matter is before the Court on Lake's motion to dismiss Anisimov's Complaint pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6) and 12(h)(3). Specifically, Lake contends that the VAWA is unconstitutional and that Anisimov fails to state a claim under the VAWA in any event. For the reasons set forth below, this Court denies Lake's motion to dismiss.

## BACKGROUND

Anisimov alleges that on four occasions, between approximately September 26, 1996 and November 19, 1996, while she was employed by Lake's Chicago dental office, Lake "engaged in crimes of violence motivated by gender." Specifically, Anisimov alleges that Lake made inappropriate sexual advances toward her including fondling her, attempting to remove her clothing, grabbing her breasts, assaulting and attempting to rape her, and ultimately luring her to a deserted office site and raping her. Anisimov maintains that in addition to suffering significant compensatory damages, she was compelled to leave her job as a result of Lake's violent acts against her.

Anisimov's lawsuit seeks damages and injunctive relief against Lake under the VAWA and Illinois common law torts of battery, false imprisonment, and intentional infliction of emotional distress. Anisimov also contends that she has filed criminal charges against Lake which are currently being prosecuted in Illinois state court.

Lake denies the allegations of Anisimov's Complaint and challenges the constitutionality of the Civil Rights Remedy provision of the VAWA, arguing that Congress exceeded its authority under either the Commerce Clause or the Fourteenth Amendment of the United States Constitution. Lake also disputes Anisimov's ability to state a claim under the VAWA and urges the Court to

dismiss her state law claims under the provisions of 28 U.S.C. § 1367. The Government has intervened pursuant to 28 U.S.C. § 2403(a), and argues in support of the constitutionality of the VAWA.

## DISCUSSION

### I. The Violence Against Women Act of 1994

In September 1994, Congress passed the VAWA, drafted in response to what its chief legislative sponsor, Senator Joseph R. Biden, called a "national tragedy." The "national tragedy" perceived by Senator Biden and Congress was "the escalating problem of violent crimes against women." S.Rep. 103–138, 103rd Cong., 1st Sess., *The Violence Against Women Act of 1993*, 38 (Sept. 10, 1993). After nearly four years of hearings, Congress concluded that a comprehensive federal approach was needed to curb the increase in gender-motivated violence and "the underlying attitude that this violence is somehow less serious than other crime." *Id.* The VAWA was the approach Congress ultimately chose.

The VAWA authorized $1.6 billion in federal spending over six years to support state and local efforts to reduce violence against women, including expenditures for law enforcement efforts, 42 U.S.C. § 3796gg, education and prevention programs, *id.* § 300w–10, battered women's shelters, *id.* § 10409(a), and a national domestic violence hotline, *id.* § 10416. The VAWA also established a civil rights remedy which affords victims of gender-motivated violence a federal cause of action. Specifically, the civil rights provision in the VAWA provides:

> [All persons] who commit[ ] a crime of violence motivated by gender and thus deprive[ ] another of the right [to be free from gender-motivated violence] shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive declaratory relief, and such other relief as a court may deem appropriate.

42 U.S.C. § 13981(c).

Congress expressly limited the civil rights provision to encompass only violent crimes "due, at least in part, to an animus based on

the victim's gender." 42 U.S.C. § 13981(d)(1). The statute does not cover "random acts of violence unrelated to gender" or "acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender...." *Id.* § 13981(e)(1). Congress explained that "[p]roof of 'gender motivation' under [VAWA's civil rights provision] should proceed in the same ways proof of race or sex discrimination proceeds under other civil rights laws." S.Rep. No. 103–138 at 52. The Act does not preempt any state criminal or civil law enforcement efforts and expressly precludes any attempt to construe its provisions to create supplemental jurisdiction over divorce cases or domestic relations disputes. *See* 42 U.S.C. § 13981(e)(4).

Congress was not under any delusion that it could eradicate the problem of violence against women. S.Rep. No. 101–545, 101st Cong., 2d Sess., *The Violence Against Women Act of 1990*, 41 (Oct. 19, 1990). Instead, the underlying goal of the VAWA Civil Rights Remedy, expressed throughout an extensive legislative record, was to place gender-motivated violence in the context of what are currently perceived to be "traditional" civil rights violations. Thus, the VAWA's civil rights provision "makes a national commitment to condemn crimes motivated by gender in just the same way as we have made a national commitment to condemn crimes motivated by race and religion." *Id.*

The VAWA Civil Rights Remedy is premised upon two independent constitutional sources of legislative authority: the Commerce Clause, section 8 of Article I of the U.S.Constitution and the Fourteenth Amendment, section 5. Lake insists that Congress exceeded its powers in enacting the VAWA Civil Rights Remedy under both the Commerce Clause and the Fourteenth Amendment, arguing that "neither of these vehicles of authority confer upon Congress the power to enact such a broad and encroaching law as the civil rights provisions of [the VAWA]."

### II. The Commerce Clause After Lopez

Under the Commerce Clause, the Constitution grants Congress the authority to regulate three broad categories of activity: (1) the use of channels of interstate com-

merce; (2) the instrumentalities of interstate commerce; and (3) activities that substantially affect interstate commerce. *United States v. Lopez,* 514 U.S. 549, 558–59, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995). The standard of Commerce Clause review by the courts has been narrow and deferential. "Judicial review in this area is influenced above all by the fact that the Commerce Clause is a grant of plenary authority to Congress. This power is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than those prescribed in the constitution.'" *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (citations omitted) (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824)). "The motive and purpose of a regulation of interstate commerce are matters ... which the Constitution places no restriction and over which the courts are given no control." *United States v. Darby,* 312 U.S. 100, 115, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941). Nevertheless, consistent with principles of judicial review set out in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the courts must ultimately decide whether Congress has exceeded its constitutionally enumerated powers and "whether a rational basis exist[s] for concluding that a regulated activity sufficiently affect[s] interstate commerce." *Lopez,* 514 U.S. at 557, 115 S.Ct. at 1629 (citations omitted); *United States v. Wilson,* 73 F.3d 675, 680 (7th Cir.1995).

A review of modern Commerce Clause jurisprudence reveals that the Supreme Court has taken a highly deferential approach to congressional determinations that a regulated activity substantially affects interstate commerce. *See Lopez,* 514 U.S. at 552–59, 115 S.Ct. at 1626–30 (discussion of Commerce Clause history). Courts have generally applied a "rational basis test" to determine the constitutionality of legislation under the Commerce Clause. In *Hodel v. Indiana,* the

Court described the "rational basis test" in this way: "A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulatory means selected and the asserted ends."[1] 452 U.S. 314, 323–24, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981). Consequently, Congress has been afforded substantial freedom by the courts to regulate any interstate activity that remotely affects interstate commerce. *See Wickard v. Filburn,* 317 U.S. 111, 128–29, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942) (local activity "whatever its nature" may be reached by Congress if it exerts a "substantial economic effect on interstate commerce"); *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968) ("where a general regulatory statute bears a substantial relationship to commerce, the de minimis character of individual instances arising under that statute is of no consequence").

Congress's freedom under the Commerce Clause was restricted for the first time in almost sixty years by the Supreme Court in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez,* the Court divided 5–4 to strike down the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), which prohibited "any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." The Court determined that in enacting the Gun–Free School Zones Act, Congress had exceeded the "outer limits" of its power under the Commerce Clause. *See id.* at 557, 115 S.Ct. at 1628–29.

After outlining the three broad categories of activity that Congress can regulate under the Commerce Clause, the Court concluded that the only possible justification for the Gun–Free School Zones Act would be as a "regulation of an activity that substantially

---

1. In his testimony before Congress, Professor Cass R. Sunstein gave an example of how the Supreme Court has approached the rational basis standard. Apparently, during oral argument before the Court, a litigant was arguing that there was no rational basis for a particular congressional enactment. In response, Chief Justice Rehnquist asked, "Are you saying, Counsel, that the Senators who voted for that bill belong in the looney bin?" S.Hrg. 102–369, 102d Cong., 1st Sess., 103 (April 9, 1991).

affects interstate commerce." *Id.* at 559, 115 S.Ct. at 1630. The Court held, however, that the Gun–Free School Zones Act could not withstand a constitutional challenge on this front because it was not "an essential part of a larger regulation of economic activity" and it did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561, 115 S.Ct. at 1631. The Court also noted that the statute did not contain express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone. *Id.* at 563, 115 S.Ct. at 1631–32. Although the Court conceded that formal findings as to the substantial burdens that an activity has on interstate commerce are not required, it felt compelled to add that, "to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here." *Id.*

Nevertheless, the Court considered the Government's contention that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and through the mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. *Id.* at 563–64, 115 S.Ct. at 1631–32. The Court rejected the Government's "cost of crime" and "national productivity" reasoning, stating that if it were to accept these arguments, it would be "hard-pressed to posit any activity by an individual that Congress is without power to regulate." *Id.* at 564, 115 S.Ct. at 1632. The Court acknowledged that by giving great deference to congressional action, some of its prior cases have "taken long steps" down the road to converting congressional authority under the Commerce Clause to a "general police power" of the sort retained by the States." *Id.* at 567, 115 S.Ct. at 1634. The Court concluded that it would not sanction "additional expansion" of congressional authority under the Commerce Clause and would "decline to proceed any further." *Id.*

In light of the fact that the Supreme Court has issued no further opinions on how to interpret Congress's authority · under the Commerce Clause, there are several questions that appear to be left unanswered. Most importantly, although the Gun–Free School Zones Act exceeded the "outer limits" of congressional authority, where do those "outer limits" begin? And while the *Lopez* decision indicated that the Court would not sanction "additional expansion" of congressional authority, did it also signal a shift in how the Court would approach what had previously been considered appropriate—or at least constitutional—congressional regulation? Finally, do congressional findings matter or should a court treat them as it would any other argument made in favor of a statute's constitutionality? A quick survey of the judicial and scholarly views on the significance of *Lopez* indicates that this Court is not alone in its uncertainty concerning how the Supreme Court will approach these issues when it considers future challenges to congressional authority under the Commerce Clause.[2]

---

**2.** *See, e.g.,* Mark Tushnet, *Living in a Constitutional Moment?: Lopez and Constitutional Theory,* 46 Case W.Res.L.Rev. 845 (1996) (exploring whether *Lopez* is a constitutional event on. the same order as the ratification of the 14th Amendment or the New Deal); Charles B. Schweitzer, *Comment Street Crime, Interstate Commerce, and the Federal Docket: The Impact of United States v. Lopez,* 34 Duq.L.Rev. 71 (1995) ("implications of the decision are uncertain and potentially far-reaching"); Richard Epstein, *Constitutional Faith and the Commerce Clause,* 71 Notre Dame L.Rev. 167, 177 (1996) (*Lopez* represents a move "from rational basis [back] to intermediate scrutiny"); Wendy M. Rogovin, *The Politics of Facts:*

*'The Illusion of Certainty',* 46 Hastings L.J. 1723, 1725 (1995) (interpreting *Lopez* and other recent decisions of the Rehnquist Court as moving away from deference to Congress); Deborah Merritt, *Commerce!,* 94 Mich.L.Rev. 674, 677 (1995) (*Lopez* applies a "toughened rational basis standard"); *Hoffman v. Hunt,* 923 F.Supp. 791, 816 (W.D.N.C.1996) (after *Lopez,* courts must engage in "meaningful judicial review of Congress' findings"); *Brzonkala v. Virginia Polytechnic and State University,* 935 F.Supp. 779, 787 (W.D.Va. 1996) (after *Lopez,* cases where regulated intrastate activity is economic in nature, do not con-

That having been said, this Court is not writing on a clean slate with respect to how the Seventh Circuit has chosen to interpret the *Lopez* decision and many of the questions it raises. Two recent Seventh Circuit decisions, *United States v. Wilson*, 73 F.3d at 675 and *United States v. Kenney*, 91 F.3d 884 (7th Cir .1996), provide significant guidance on how congressional authority under the Commerce Clause should be evaluated after *Lopez*. In these decisions, which upheld two criminal statutes under the Commerce Clause, the Seventh Circuit concluded that although *Lopez* was significant for its result, "the Supreme Court reaffirmed, rather than overturned, the previous half century of Commerce Clause precedent in *Lopez*." *Wilson*, 73 F.3d at 685; *see also Kenney*, 91 F.3d at 887 ("The majority [in *Lopez* ] indicated that it intended to establish an outer limit to congressional authority, not to retrench well-established Commerce Clause precedent.").

In *Wilson*, the Seventh Circuit rejected a Commerce Clause challenge to the constitutionality of the Freedom of Access to Clinic Entrances Act—a law permitting federal criminal prosecution of antiabortion protestors who interfered with persons seeking to provide and obtain reproductive health services. The *Wilson* opinion criticized the district court for giving "no deference to Congress's finding" that obstruction of reproductive health care facilities interferes with interstate commerce. 73 F.3d at 680. The Seventh Circuit explained that the critical question under the Commerce Clause analysis is "whether the regulated activities substantially affect interstate commerce." *Id.* And when answering this question, courts must defer to a congressional finding and "need only look for a rational basis" for this finding. *Id.* (citing *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360); *see also Kenney*, 91 F.3d at 891 ("deference to Congress's accumulated institutional expertise is appropriate"). The court further opined that, "[i]t is easy enough to imagine congressional findings that, if found rational, could have made *Lopez* a very different case." *Id.* at 684.

The *Wilson* court also rejected the district court's contention that after *Lopez*, Congress

trol cases where regulated intrastate activity is

could not regulate private conduct that affects commercial entities rather than commercial entities themselves. The court declared that "[t]here was no authority for the proposition that Congress's power extends only to the regulation of commercial entities. To the contrary, courts have upheld numerous statutes which regulate private conduct that affects commercial entities or commercial activity." *Id.* (citing *Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) as an example). Thus, the court concluded that the substantial effects test is not limited to the regulation of economic activities, but includes regulations that "reach or affect economic activities." *Id.* at 685.

In addition, the court rejected a characterization of *Lopez* that would require federal regulations to contain a jurisdictional element ensuring that the proscribed conduct substantially affects interstate commerce. The Seventh Circuit insisted that *Lopez* did not state or imply that statutes must have such an element, or "that all statutes with such an element would be constitutional, or that any statute without such an element is per se unconstitutional." *Id.* (citing *Lopez*, 514 U.S. at 562, 115 S.Ct. at 1631).

### III. *The VAWA Civil Rights Remedy and the Commerce Clause*

Although the Court does not write on a clean slate when addressing the *Lopez* decision, there is considerably less authority concerning the constitutionality of the VAWA Civil Rights Remedy. The Court is aware of four district court opinions from various regions of the country that have considered the constitutionality of the VAWA. Three of these courts have upheld the Civil Rights Remedy under the Commerce Clause, *Doe v. Doe*, 929 F.Supp. 608 (D.Conn.1996); *Doe v. Hartz*, 970 F.Supp. 1375 (N.D.Iowa 1997); *Seaton v. Seaton*, 971 F.Supp. 1188 (E.D.Tenn.1997), while one court has struck it down under both the Commerce Clause and the Fourteenth Amendment, *Brzonkala v. Virginia Polytechnic & State University*, 935 F.Supp. 779 (W.D.Va.1996). As yet, no

not economic).

circuit, including our own, has addressed the constitutionality of the VAWA Civil Rights Remedy.

This Court begins its analysis of the VAWA with the four years of congressional hearings and lengthy congressional findings in support of the substantial effect of gender-motivated violence upon interstate commerce.[3] This Court, like the district court in *Doe v. Hartz*, concludes that the congressional findings on the scope of the problem of gender-based violence are startling:

- "Violence is the leading cause of injury to women ages 15–44, more common than automobile accidents, muggings, and cancer deaths combined." S.Rep. No. 103–138 at 38.

- "Every week, during 1991, more than 2,000 women were raped and more than 90 women were murdered—9 out of 10 by men." *Id.*

- "[W]omen in the United States are at least three times more likely to become rape victims than their European counterparts." Serial No. 42, *Hearing before the House Committee on the Judiciary, Subcommittee on Crime and Criminal Justice*, 102d Cong., 2d Sess., 62 (Feb. 6, 1992).

- "[F]or the past 4 years [prior to 1993], the U.S. Surgeons General have warned that family violence—not heart attacks or cancer or strokes—poses the single largest threat of injury to adult women in this country." S.Rep. No. 103–138 at 41–42.

- "Three out of four American women will be victims of violent crimes sometime during their life." H.R.Rep. No. 103–395, 103rd Cong., 1st Sess., *Violence Against Women Act of 1993*, 25 (Nov. 20, 1993).

The congressional findings also contain a letter, signed by 42 State Attorneys General agreeing that violence against women is a serious national problem and urging passage of the VAWA. In pertinent part, the letter reads: "Our experience as Attorneys General strengthens our belief that the problem of violence against women is a national one, requiring federal attention, federal leadership, and federal funds." Letter from States' Attorneys General, Serial No. 51, 103rd Cong., 1st Sess., *Crimes of Violence Motivated by Gender*, 35 (Nov. 16, 1993). *See also Doe*, 929 F.Supp. at 611 (citing similar findings); *Hartz*, 970 F.Supp. 1375 (same).

Congress's finding that violence against women is a national problem does not, standing alone, justify its power to enact the VAWA under the Commerce Clause. However, in addition to illuminating the scope of the problem of violence against women, Congress also made detailed findings concerning how gender-motivated violence substantially affects the national economy and interstate commerce. Congress found:

- "[G]ender-based violence bars its most likely targets—women—from full [participation] in the national economy." S.Rep. No. 103–138 at 54.

- Domestic violence alone costs employers an estimated $3 to $5 billion annually due to absenteeism from the workplace. S.Hrg. 101–939, Pt. 1, 101st Cong., 2d Sess., *Women and Violence*, 58 (June 20, 1990).

- Estimates suggest "that we spend $5 to $10 billion a year on health care, criminal justice and other social costs of domestic violence." S.Rep. No. 103–138 at 41.

- "[A]s many as 50 percent of homeless women and children are fleeing domestic violence." S.Rep. No. 101–545 at 37.

- "[A]lmost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime." S.Rep. No. 103–138 at 54.

- Fear of gender-based violence "deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence." *Id.*

Accordingly, the Court will limit its focus to whether the VAWA is a constitutional regulation of an activity that "substantially affects interstate commerce."

---

**3.** The Court does not find any justification supporting the VAWA as a regulation of either "a channel" or "an instrumentality" of commerce. The Government does not dispute this finding.

- Women often refuse higher paying night jobs in service and retail industries because they fear attack. *See id.* at 54 n. 70; *see also, e.g.,* S.Hrg. 102–369, 102d Cong., 1st Sess., *Violence Against Women: Victims of the System,* 86 (April 9, 1991) (testimony of Burt Neuborne) (Women "tend to choose their jobs with one eye looking over their shoulder about their safety").

- Fear of gender-motivated violence deters women from using public transportation and thus "acts as a barrier to mobility, particularly for those women who have no alternative to public transportation because of economic constraints." S.Hrg. 101–939, Pt. 1, at 69 (testimony of Helen Neuborne); *see also* S.Hrg. 102–369 at 2 (statement of Sen. Biden citing survey finding that approximately one-half of the women responding said they never use public transportation after dark).

- "Gender-based crimes and fear of gender-based crimes restrict movement, reduce employment opportunities, increase health expenditures, and reduce consumer expending, all of which affect interstate commerce and the national economy." S.Rep. No. 103–138 at 54.

Congress summarized these findings, and determined that "crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting business . . . in interstate commerce. . . ." H.Rep. 103–711, 103rd Cong., 2d Sess., *Violent Crime Control and Law Enforcement Act of 1994,* 385 (Aug. 21, 1994). Accordingly, Congress concluded that its authority to enact the VAWA's civil rights provision "is firmly based on the Commerce Clause. . . ." S.Rep. No. 103–138 at 54.

■ Before proceeding further with the constitutional analysis of the VAWA, it is necessary to emphasize the Court's role in our system of constitutional government. The question before the Court is not whether the VAWA is necessary or whether better solutions to the problem of gender-motivated violence exist. *See Seaton,* 971 F.Supp. at 1194 (whether Congress could have fashioned VAWA to avoid domestic litigation "not appropriately within this court's purview"). That is for Congress to decide. The question before this Court is whether a rational basis exists for concluding that gender-motivated violence affects interstate commerce. And if it does, whether the VAWA is a reasonably adapted means to the intended goal of Congress. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2359–60.

It is uncontested that violence against women is a "national tragedy" of epidemic proportions, but does it substantially affect interstate commerce?[4] After carefully reviewing the extensive congressional findings and affording them the deference that the Seventh Circuit has instructed is still required in the post-*Lopez* era, the Court concludes that there was a rational basis for Congress's conclusions that gender-motivated violence has a substantial effect on interstate commerce. Unlike the Supreme Court in *Lopez,* this Court has not been asked to "pile inference upon inference" to evaluate the connection between violence against women and interstate commerce—Congress has meticulously articulated the connection. *See Doe,* 929 F.Supp. at 614; *cf. Lopez,* 514 U.S. at 567, 115 S.Ct. at 1633–34. It is certainly not irrational for Congress to determine that the nationwide impact on commerce of women withdrawing from the workplace, being deterred from traveling interstate and reducing their consumer expending as a result of gender-motivated violence is at least as substantial as that of excess "home-grown" wheat on an Ohio farm or an Alabama barbeque's refusal to serve

---

4. In stressing the importance of the congressional findings, the Government concedes, and the Court agrees, that the economic effects of violence against women are not "visible to the naked eye." *See Lopez,* 514 U.S. at 563, 115 S.Ct. at 1631–32. With this in mind, the Court also takes note of testimony before Congress that "women have been subject to gender-based violence for so long and on such a scale in our society that we have difficulty perceiving the enormity of its impact." H.R.Rep. 103–395 at 40 (testimony of Burt Neuborne).

African–Americans.[5] *See Wickard v. Filburn*, 317 U.S. at 111, 63 S.Ct. at 82; *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Moreover, this Court believes that to set aside four years of extensive and well-reasoned congressional findings demonstrating the substantial effect of gender-motivated violence on interstate commerce would be to usurp a constitutional role that the Court was not allotted.

Lake argues that the congressional findings underlying the VAWA are no more than a recast version of the "costs of crime" argument rejected by the Supreme Court in *Lopez*. Lake goes on to outline the usual parade of horribles—legislation concerning the extraordinary costs of insomnia on the national economy for example—and contends that the reasoning offered by Congress "has no logical stopping point" and would extend Congress's power to "an unbounded extreme." Initially, the Court does not agree that the specific congressional findings underlying the VAWA are analogous to the more generic arguments offered by the Government in *Lopez*. Moreover, the comparison offered by Lake ignores the Seventh Circuit's pronouncement that "congressional findings matter." *Wilson*, 73 F.3d at 684 ("It is easy enough to imagine congressional findings that, if found rational, could have made *Lopez* a very different case."). Similarly, Lake's parade of horribles ignores the fact that Congress did not merely conclude that gender-motivated violence has "some effect" on the national economy before enacting the VAWA, Congress found that gender-motivated violence had a "substantial effect on interstate commerce." The Seventh Circuit explained the distinction in this way:

> It is easy enough to analyze a finding ... at the highest level of generality to find it applicable in virtually every situation. But the rational basis test, properly applied, is very different: it requires courts to defer to Congress on a case-by-case basis when Congress's findings reveal a substantial relationship to interstate commerce. Thus the rational basis test, focusing as it does

on the substantial nature of the relation to interstate commerce in an individual case, operates at a much lower level of generality.

*Id.* at 682 n. 7.

The Court is mindful of the dangers of permitting Congress to proclaim the extent of its own power. *See Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60. In particular, there is always a risk that Congress will conduct hearings and compile information in an attempt to concoct a rational basis for a statute. Therefore, the role of the courts, as protectors of the Constitution, is to ensure that Congress has a rational basis for its findings. *See Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360. Given the extensive compilation of data, testimony and reports, "it is unlikely Congress would spend four years determining the effects of gender-based violence on interstate commerce for the sole purpose of overcoming the rationality test and the Supreme Court's decision in *Lopez*, especially since *Lopez* was decided after the congressional hearings and findings began being made." *Seaton*, 971 F.Supp. at 1194. This Court is satisfied that the congressional findings underlying the VAWA should be regarded as more than a mere pretext for congressional authority.

After finding that Congress rationally concluded that the VAWA Civil Rights Remedy regulates activities substantially related to interstate commerce, the Court must next inquire whether Congress chose a regulatory means "reasonably adapted" to a permissible end. *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360; *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 259, 85 S.Ct. 348, 358–59, 13 L.Ed.2d 258 (1964). Congress enacted the VAWA Civil Rights Remedy after concluding that the state judicial systems were not offering adequate protection from gender-motivated crimes. Congress found—after reviewing the states' own assessments of their treatment of violence against women—that "bias and discrimination in the criminal

---

**5.** Lake maintains that the VAWA concerns a "non-economic" intrastate activity and is therefore precluded by *Lopez*. As discussed previously, this argument was rejected by the Seventh Circuit in *Wilson*, 73 F.3d at 685 ("we find no support for reading *Lopez* as permitting only regulation of economic activities").

justice system often deprive[ ] victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled." H.R.Rep. No. 103–711 at 385. Following the well-worn course of enacting legislation designed to protect civil rights inadequately safeguarded by the states, *see, e.g., Katzenbach,* 379 U.S. 294, 85 S.Ct. 377. Congress created a civil rights remedy for gender-motivated violence. Although the Court is reluctant to conclude that this was the only or even the best method available to Congress to protect the victims of gender-motivated violence, *see Seaton,* 971 F.Supp. at 1194, it is certainly a reasonable means to a worthy goal.

■■■ Finally, this Court's discussion of the constitutionality of the VAWA Civil Rights Remedy would not be complete without addressing the federalism-based concerns raised by the Supreme Court in *Lopez.* In *Lopez,* the Supreme Court was clearly troubled by what it perceived as the Federal Government encroaching on an area such as criminal law "where States historically have been sovereign." 514 U.S. at 564, 115 S.Ct. at 1632. Unlike the statute at issue in *Lopez,* the Civil Rights Remedy provided by the VAWA was not designed to duplicate or usurp the authority of the States. The civil rights provision was designed to redress an area of civil rights violations that were not being adequately protected by the States. The Supreme Court has historically recognized that with respect to civil rights legislation:

> The power of Congress in this field is broad and sweeping; where it keeps within its sphere and violates no express constitutional limitation it has been the rule of this Court, going back almost to the founding days of the Republic, not to interfere.

*Katzenbach,* 379 U.S. at 305, 85 S.Ct. at 384. This Court is firmly convinced that this "rule" has survived *Lopez.*

Consistent with the above discussion, the Court concludes that the VAWA's Civil Rights Remedy is a permissible exercise of congressional authority under the Commerce Clause, and reasonably adapted to its goal of providing redress to victims of gender-moti-

vated violence. Because the Court concludes that Congress has authority to enact the VAWA under the Commerce Clause, it need not and does express any opinion regarding whether the Fourteenth Amendment also authorizes Congress to enact the VAWA.

## IV. *Anisimov's Claim Under the VAWA*

When considering a motion to dismiss, the Court examines the sufficiency of the Complaint, not the merits of the lawsuit. *Triad Assocs. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A motion to dismiss will be granted only if the Court finds that the plaintiff can prove no set of facts that would entitle her to relief. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 432 (7th Cir.1993); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). On a motion to dismiss, the Court draws all inferences and resolves all ambiguities in the plaintiff's favor and assumes that all well-pleaded facts are true. *Dimmig v. Wahl,* 983 F.2d 86, 86 (7th Cir.1993).

Lake argues that the legislative history of the VAWA indicates that not all crimes committed by a man against a woman are "gender motivated." In particular, Lake contends that the VAWA does not create a civil rights claim for every alleged rape, but that the victim must allege "specific concrete facts" that the crime was "motivated by gender." According to Lake, Anisimov's allegations of rape do not meet these requirements. Lake relies on *Brzonkala v. Virginia Polytechnic and State University,* 935 F.Supp. 779, 783 (W.D.Va.1996), where the court held that "All rapes are not the same." The court described the characteristics of various types of rape and went on to elaborate upon which rapes it viewed as the "most egregious." *Id.* at 784–85. The court also opined that "stranger rape generally more likely than date rape involves gender animus." *Id.* at 785. Using these dubious findings as a springboard, Lake makes the outrageous assertion that

the facts alleged by Anisimov "show nothing more than the plaintiff was allegedly sexually assaulted in an encounter which she initiated with the defendant by going into his automobile and/or into an empty office." This Court does not agree.

■ During the hearings which prompted the VAWA, Congress heard lengthy testimony about prevailing stereotypes that discourage women from reporting sexual assault and prevent them from receiving equal treatment as victims of gender-motivated violence. In particular, Congress renounced "the widespread belief that people who are raped precipitate in some way, whether it be by dress, having a drink in a bar, *accepting a ride in a car* or accepting a date." S.Rep. No. 102–197, 102d Cong., 1st Sess., *The Violence Against Women Act of 1991*, 47 (Oct. 29, 1991) (emphasis added). In light of the language and stated purpose of the VAWA, whether Anisimov voluntarily entered Lake's car or office is no more relevant to her civil rights claim than if an African–American family voluntarily moved into a "white neighborhood" and found a burning cross on their lawn. Neither victim "asked for it," and the focus of the Court should not be diverted from the actions of the defendant to those of the victim.

■ That having been said, the Court acknowledges that—particularly in the case of an alleged rape—it can be extremely difficult to separate crimes of violence from crimes of violence "motivated by gender." Although Congress clearly did not intend to designate rape as a per se "crime of violence motived by gender," the cases where it is not would appear to this Court to be few and far between. So while the Court agrees with the *Brzonkala* court that "all rapes are not the same," the Court does not endorse the broad characterizations of rape made in *Brzonkala* and concludes that this issue—whether a crime is motivated by gender—must be addressed on a case-by-case basis.

■ The Court finds that Anisimov's allegations that Lake made inappropriate sexual advances toward her including fondling her, attempting to remove her clothing, grabbing her breasts, assaulting and attempting to

rape her, and ultimately luring her to a deserted office site and raping her, are sufficient to meet the minimal federal pleading requirements and state a claim under the VAWA's Civil Rights Remedy.

Finally, the Court certifies this entire matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), because the Court is of the opinion that this Order involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the Order may materially advance the ultimate termination of the litigation. Moreover, the Court is aware of the potential for delay that exists in light of the pending criminal proceedings against Lake and his Fifth Amendment rights under the circumstances.

## CONCLUSION

For the foregoing reasons, the Court denies Lake's motion to dismiss. This Order is certified for interlocutory appeal, but this matter is not stayed while any such interlocutory appeal is pending. 28 U.S.C. § 1292(b).