**Michele J. ZIEGLER, and her adult children, Luke Ziegler and Journee Ziegler, Plaintiffs,**

v.

**Reid T. ZIEGLER, Defendant.**

**United States of America, Intervener.**

**No. CS–97–0467–WFN.**

United States District Court,
E.D. Washington.

Sept. 24, 1998.

Order Denying Reconsideration,
Nov. 5, 1998.

602

Richard C. Eymann, John David Allison, Feltman Gebhardt Eymann & Jones, Spokane, WA, Katrin E. Frank, Seattle, WA, Andrea Brenneke, Northwest Women's Law Center, McDonald Hoague & Bayless, Seattle, WA, for Michelle J. Ziegler, Luke Ziegler, Journee Ziegler.

Mary Elizabeth Schultz, Mary E. Schultz & Associates, PS, Spokane, WA, for Reid T. Ziegler.

Karen Linda Sayre, Sayre & Sayre PS, Spokane, WA, Andrea B. Williams, Martha F. Davis, Legal Defense and Education Fund, New York City, Elizabeth A. Billowitz, Foley Hoag & Eliot L.L.P., Boston, MA, for Now Legal Defense and Education Fund.

James P. Connelly, James Richard Shively, U.S. Attorney's Office, Spokane, WA, John R. Tyler, Marcia K. Sowles, Frank W. Hunger, U.S. Attorney General, Department of Justice, Civil Division Fed. Programs Branch, Washington, DC, for USA.

## ORDER

NIELSEN, Chief Judge.

A hearing was held July 21, 1998 on Defendant's Motion to Dismiss (Ct.Rec.6). Defen-

dant was represented by Mary Schultz; Plaintiffs were represented by Richard Eymann, Andrea Brenneke and John Allison; and the Intervener, United States, was represented by Marcia Sowles.

The Court took the Motion under advisement. In addition to oral argument, the Court considered the briefing and attached exhibits.[1] For the reasons stated below, the Motion to Dismiss is denied in part and the Court reserves ruling in part.

## I. BACKGROUND

Michelle Ziegler [hereinafter Plaintiff] brings an Amended Complaint against Reid Ziegler under the civil enforcement provision of the Gender–Motivated Violence Act [GMVA], 42 U.S.C. § 13981, as well as state law claims of: malicious harassment, tort of domestic violence, outrage, assault and battery, and defamation. Luke Ziegler and Journee Ziegler join their mother as Plaintiffs on the state law claim of outrage. The Amended Complaint alleges some ten years of spousal and gender-motivated violence against Plaintiff by Defendant.

Defendant asserts that the Amended Complaint fails to state a claim upon which relief can be granted. Defendant also challenges the constitutionality of the GMVA on its face and as applied. Finally, Defendant asserts that the state law claims are barred by the statute of limitations; that the tort of domestic violence does not exist as a cause of action in Washington State; and/or that the Court should decline to exercise supplemental jurisdiction over the state claims.

The Government has intervened pursuant to 28 U.S.C. § 2403(a) and argues in support of the constitutionality of the GMVA. The National Organization of Women Legal Defense and Education Fund [NOW] was granted leave to file an *amicus* brief and also argues in support of the constitutionality of the GMVA.

## II. FAILURE TO STATE A CLAIM

Defendant's Motion to Dismiss for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6) must be considered prior to reaching any constitutional questions. *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (before reaching a constitutional question, federal courts are required to consider non-constitutional grounds for decision). Fed.R.Civ.P. 12(b)(6) provides for dismissal of causes of action for "failure to state a claim upon which relief can be granted." The issue is not whether Plaintiff is likely to succeed on the merits, but only if the Amended Complaint is legally sufficient to entitle Plaintiff to proceed beyond the pleadings and attempt to establish her claim. *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir.1978). Plaintiff's allegations must be accepted as true and the Amended Complaint is construed in the light most favorable to her. *Love v. United States,* 915 F.2d 1242, 1245 (9th Cir.1989). This Court should grant the Motion to Dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

42 U.S.C. § 13981 sets forth a cause of action under the GMVA as follows:

A person ... who commits a crime of violence motivated by gender and thus deprives another of the right [to be free from crimes of violence motivated by gender] shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and other relief as a court may deem appropriate.

42 U.S.C.S. 13981(c) (1997). To state a claim under the GMVA, Plaintiff must allege she was a victim of (1) a crime of violence that (2) was motivated by gender. *Crisonino v. New York City Housing Authority,* 985 F.Supp. 385, 391 (S.D.N.Y.1997).

---

1. The Court considered only exhibits that were directly related to the issues raised, e.g., the legislative hearings and reports, regarding 42 U.S.C. § 13981. The Court did not consider exhibits that dealt only generally with the topic of gender-motivated violence. Accordingly, the Motion to Dismiss was not converted to one for summary judgment pursuant to Fed.R.Civ.P. 12(b)(6).

*Element One—Crime of Violence:* A crime of violence means:

> an act or series of acts that would constitute a felony against the person ... if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in § 16 of title 18, United States Code, whether or not those act have actually resulted in criminal charges, prosecution, or conviction....

42 U.S.C.S. § 13981(d)(2)(A) (1997). In addition, the statute provides that "[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action...." 42 U.S.C.S. § 13981(e)(2) (1997).

18 U.S.C. § 16 defines crime of violence as

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16 (West 1998).

Defendant does not dispute that the violent acts alleged by Plaintiff in the Amended Complaint satisfy the first element of a cause of action under the GMVA. Alleged crimes of violence occurring on at least five occasions after the effective date of the GMVA, September 13, 1994, would constitute state felony crimes that include as an element the use, attempted use or threatened use of physical force.[2]

*Element Two—Crime Motivated by Gender:* The GMVA requires that the crime of violence be committed

> because of gender or on the basis of gender, and due in part, to an animus based on the victim's gender.

42 U.S.C.S. § 13981(d)(1) (1997). The statute specifically precludes a cause of action

> for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender (within the meaning of subsection (d)).

42 U.S.C.S. § 13981(e)(1) (1997).

Gender motivation is to be determined from the totality of the circumstances as it is for race or sex discrimination and it can be proven by circumstantial evidence. S.REP. No. 102–197, at 50 (1991). The GMVA definition of gender-motivated crime is based on Title VII which prohibits gender-based employment discrimination. Congress intends that Title VII cases provide substantial guidance in assessing whether the alleged violence is based on gender. S.REP. No. 103–138, at 52–53 (1993). Generally accepted guidelines for identifying hate crimes may also be useful in assessing whether the circumstances show gender-motivation. S.REP. No. 102–197, at 50, n. 72 (1991).

Here evidence of gender motivation includes:

(a) At least one incident of rape, Amended Compl. ¶ 26, and numerous incidents of violence associated with sexual issues. Amended Compl. ¶¶ 24, 25 and 29. *Nichols v. Frank,* 42 F.3d 503, 510 (9th Cir.1994) ("Nothing is more destructive of human dignity than being forced to perform sexual acts against one's will. Rape is still the ultimate violation");

---

**2.** 1. **08/11/95:** Defendant chased Plaintiff in automobile with intent to run over the Plaintiff (Amended Compl. ¶ 21)—attempted assault in the first degree, R.C.W.A. 9A.36.011(1)(c) (1998 Supp.), or assault in the second degree, R.C.W.A. 9A.36.021(1) (1998 Supp.), or attempted vehicular assault, R.C.W.A. 46.61.522(1)(a) (1998 Supp.);

2. **10/27/95:** Forced to remain on a chair for extended period of time (Amended Compl. ¶ 22)—unlawful imprisonment, R.C.W.A. 9A.40.040(1) (1998);

3. **11/01/95:** Struck on back, causing substantial disfigurement and impairment (Amended Compl. ¶ 23)—assault in the second degree, R.C.W.A. 9A.36.021(1) (1998 Supp.);

4. **12/02/95:** Defendant said he was waiting for Plaintiff at their home with a loaded shotgun (Amended Compl. ¶ 50)—harassment, R.C.W.A. 9A.46.020(1)(a)(i) (1998 Supp.); and

5. **12/04/95:** Verbal threats and harassment after separation (Amended Compl. ¶ 51)—stalking, R.C.W.A. 9A.46.110 (1998 Supp.); malicious harassment, R.C.W.A. 9A.36.080(1) (1998 Supp.).

(b) Gender-specific epithets by Defendant against the Plaintiff. Amended Compl. ¶ 30. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (president insulted plaintiff because of her gender, stating she was a "dumb ass woman" and "you're a woman, what do you know.");

(c) Acts that perpetuated stereotype of submissive role for Plaintiff by, e.g., Defendant controlling all of the family's financial information and documents, Amended Compl ¶ 37; holding all her personal documents, including her passport, Amended Comp. ¶ 38; not placing her name on title documents, Amended Compl. ¶ 40; not disclosing insurance information to her, Amended Compl. ¶ 41; and being angry if she questioned him about the family affairs, Amended Compl. ¶ 42. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 235–37, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (sexual stereo-typing occurred when promotion was denied to a woman on the basis of a partner's comment that the woman was too aggressive for a woman, was macho, and needed to be more feminine in appearance);

(d) Severe and excessive attacks on the Plaintiff, Amended Compl. ¶ 27, especially during her pregnancy, Amended Compl. ¶¶ 17–19. S.Rep. No. 102–197, at 50 n. 72 (1991) (consider severity of attack in assessing whether crime is bias related); and

(e) The alleged violence was often without provocation and specifically at times when the Plaintiff asserted her independence. Amended Comp. ¶ 26. S.Rep. No. 102–197, at 50 n. 72 (1991) (consider lack of provocation in assessing whether crime is bias related).

The Defendant is undoubtedly correct that there may be many causes of violence within a marital relationship. Here, the alleged facts however, present more than conclusory allegations and could reasonably result in an inference of gender-motivated violence. Senator Biden is quoted by the Defendant as saying that the statute is not even intended to cover "everyday domestic violence cases" or crimes motivated by personal animosity. S.Rep. No. 102–197, at 69–70 (1991). If a victim of domestic violence however, can prove the violence was gender-motivated, the statute clearly applies.

The Court concludes that the Complaint is legally sufficient. There are clearly a set of facts that could be proved consistent with the allegation that the Defendant's alleged crimes of violence were gender motivated and due in part to animus based on the victim's gender. Thus the 12(b)(6) motion must be denied.

## III. CONSTITUTIONALITY OF THE GMVA UNDER THE COMMERCE CLAUSE

The Defendant asserts that the GMVA is an unconstitutional extension of Congress' authority to regulate interstate commerce under the Commerce Clause. The Constitution provides that "Congress shall have the Power ... [t]o regulate commerce ... among the several States...." U.S. Const. art. I, § 8, cl. 1, 3. Three categories of activities may be regulated under Congress' commerce power: (1) "the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, a person or things in interstate commerce, even though the threat may come from only intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce ... i.e., those activities that substantially affect interstate commerce." *United States v. Lopez,* 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

If regulation is of activities in categories 1 or 2—the regulation is of interstate commercial activities and no substantial affect on interstate commerce need be shown. *United States v. Ripinsky,* 109 F.3d 1436, 1444 (9th Cir.1997), *cert. denied sub nom. Kingston v. United States,* —— U.S. ——, 118 S.Ct. 870, 139 L.Ed.2d 767 (1998). It is only for regulation of activities which are purely intrastate (category 3) that a showing of an affect on interstate commerce must be made. *Id.* If the activity is commercial, only a minimal affect needs to be shown. *Id.* If the activity is non-commercial a substantial affect must be shown. *Id.*

Here the issue is whether the GMVA constitutes a legitimate exercise of Congress' power under the third category. *Anisimov*

*v. Lake,* 982 F.Supp. 531, 537 n. 3 (N.D.Ill. 1997); *Seaton v. Seaton,* 971 F.Supp. 1188, 1192 (E.D.Tenn.1997).[3] The parties agree that the non-commercial nature of the regulated activity requires that a substantial affect on interstate commerce be shown. If such affect is shown, "the *de minimis* character of individual instances arising under that statute is of no consequence." *Maryland v. Wirtz,* 392 U.S. 183, 196 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), *overruled on other grounds sub nom. National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

The Court begins its analysis by recognizing that review of an Act of Congress is by nature deferential, as Acts of Congress are entitled to a strong presumption of validity and constitutionality. *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); *United States v. Henson,* 123 F.3d 1226, 1232 (9th Cir.1997). As the Supreme Court has stated

"When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons." *Bowsher v. Synar,* 478 U.S. at 736, 106 S.Ct. 3181.

*Mistretta v. United States,* 488 U.S. 361, 384, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Review of whether a statute is a constitutional exercise of Congress' Commerce Clause power is also relatively narrow. *Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *United States v. Lopez,* 514 U.S. at 568, 115 S.Ct. 1624 (Kennedy, J. concurring) (court must exercise great restraint before determining that Congress exceeded its Commerce Clause authority).

Although the Supreme Court invalidated a criminal statute, the Gun–Free Zone Act of 1990, 18 U.S.C. § 922(q)(1)(A), because it exceeded Congress' Commerce Clause authority in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Ninth Circuit does not interpret *Lopez* as overruling earlier Commerce Clause precedent. *United States v. Henson,* 123 F.3d at 1232. Nor does the Circuit believe that *Lopez* made the test of Congress's authority more critical. *United States v. Kim,* 94 F.3d 1247, 1249 (9th Cir. 1996). The Circuit has determined that the Supreme Court in *Lopez* used the same analysis that previously existed. *Id.* The two-prong test to be applied by this Court is not disputed by the parties and predates *Lopez.* The Court must determine:

1. If there is a rational basis for a Congressional finding that the regulated activity affects interstate commerce, *Hodel,* 452 U.S. at 276, 101 S.Ct. 2352; *see Lopez,* 514 U.S. at 562–63, 115 S.Ct. 1624, and if so,

2. Whether the means chosen was reasonably adapted to the end permitted by the Constitution. *Hodel,* 452 U.S. at 276, 101 S.Ct. 2352.

The Court must look for support for the statute in the legislative record. *See City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2169, 138 L.Ed.2d 624 (1997). Congressional findings must be considered, although Congress is not required to make them. *Lopez,* 514 U.S. at 562, 115 S.Ct. 1624. If there is any rational basis for a Congressional finding, the Court must defer to it. *Hodel,* 452 U.S. at 276, 101 S.Ct. 2352; *United States v. Bramble,* 103 F.3d 1475, 1482 (9th Cir.1996) (post-*Lopez* case which upheld Eagle Protection Act as constitutional because Congress "had a rational basis on which to conclude that the extinction of the eagle would have a substantial effect on interstate commerce"); *United States v. Michael R.,* 90 F.3d 340, 345 (9th Cir.1996) (post-*Lopez* case stating due deference must be given to legislative findings). The Court may not assume, however, that just because Congress says an activity substantially affects interstate commerce, that it in fact does. *Hodel,* 452 U.S. at 311, 101 S.Ct. 2352 (Rehnquist, J., concurring).

---

**3.** Although *amici* suggests that the GMVA constitutes a legitimate exercise of Congress' power under the first and second categories, Brief *Amici Curiae* filed 3/30/98, p. 14 n. 9, it does not support that assertion.

**(a) Is there a rational basis for a Congressional finding that gender motivated violence affects interstate commerce?**

The GMVA's constitutionality has been addressed by eight district courts to date. Four courts have upheld the constitutionality of the GMVA in published opinions, *Crisonino v. New York City Housing Authority*, 985 F.Supp. 385 (S.D.N.Y.1997); *Anisimov v. Lake*, 982 F.Supp. 531 (N.D.Ill. 1997); *Seaton v. Seaton*, 971 F.Supp. 1188 (E.D.Tenn.1997); *Doe v. Doe*, 929 F.Supp. 608 (D.Conn.1996), and three in unpublished opinions, *C.R.K. v. Martin*, No. 96–1431 (D.Kan. July 10, 1998); *Timm v. Delong*, No. 8:98CV43 (D.Neb. June 22, 1998); *Mattison v. Click Corp. of America*, 1998 WL 32597 (E.D.Pa. Jan. 27, 1998).[4] Only one district court found the statute to be unconstitutional, but the Fourth Circuit Court of Appeals reversed and rehearing *en banc* has been granted. *Brzonkala v. Virginia Polytechnic & State Univ.*, 935 F.Supp. 779 (W.D.Va. 1996), *rev'd by* 132 F.3d 949 (4th Cir.1997), *reh'g en banc granted and opinion vacated*, 2/5/98. The Ninth Circuit has not addressed the issue and there are no published district court cases in the Ninth Circuit on the issue.

Congress conducted lengthy hearings over four years on the scope of the problem of gender motivated violence and its affect on interstate commerce. Legislation to Reduce the Growing Problem of Violent Crime against Women, Hearing before the Committee on the Judiciary United States Senate, 101st Cong. (1990) [Senate Hearing 101–939]; a Bill to Combat Violence and Crimes Against Women on the Streets and in Homes, Hearing Before the Committee on the Judiciary United States Senate, 102nd Cong. (1991) [Senate Hearing 102–369]; Violence Against Women, Hearing before the Subcommittee on Crime and Criminal Justice of the Committee of the Judiciary House of Representatives 102nd Cong. (1992) [HR Hearing 102–42]; Hearing on Domestic Violence, Hearing before the Committee on the Judiciary United States Senate, 103rd Cong. (1993) [Senate Hearing 103–596]; Crimes of Violence Motivated by Gender, Hearing Before the Subcommittee on Civil and Constitutional Rights of the Committee of the Judiciary, House of Representatives 103rd Cong. (1993) [HR Hearing 103–51].

At these hearings, testimony was received from victims of violence; representatives from district attorneys offices, domestic violence programs, the National Federation of Business and Professional Women, the Judicial Conference of the United States, NOW, the American Civil Liberties Union, the National Association of Women Judges, and the Department of Justice; state attorneys general; and legal professors.

The evidence presented included the following:

—Victims of rape and domestic violence are not singled out because of their individual circumstances, but because of their sex. Senate Hearing 101–939 at 62.

—Women are attacked where men are safe. *Id.* at 63.

—One-third of female homicide victims are killed by their husband or a boyfriend. *Id.* at 63.

—Thirteen states report a sexist bias in their state legal system. *Id.* at 65.

—9.3% of abused women report taking time off from their employment. *Id.* at 68–69.

—The high incidence of crime results in economic effects on both the lives of the victims and interstate commerce. *Id.* at 69.

—Domestic violence is estimated to cost employers $3–5 billion per year due to absenteeism. *Id.* at 69.

—One-third of women seeking emergency room treatment in Illinois have been severely beaten by a husband. Senate Hearing 102–369 at 65.

—Medical costs related to domestic abuse are estimated to be $100 million a year directly impacting the cost of medical benefits paid by an employer. *Id.* at 240.

---

4. The GMVA was also found to be constitutional by the District Court in *Doe v. Hartz*, 970 F.Supp. 1375 (N.D.Iowa 1997), *rev'd* 134 F.3d 1339 (8th Cir.1998). The Eighth Circuit held, however, that the plaintiff had failed to state a claim under the GMVA, so it did not reach the constitutional question. *Doe v. Hartz*, 134 F.3d 1339, 1344 (8th Cir.1998).

—Rape and sexual assault are not sexual crimes, but hate crimes. *Id.* at 25, 85.

—Too often a man will beat a woman and punctuate his attack with hate-filled exclamations demeaning her gender. *Id.* at 63.

—American women are three times more likely to be victims of rape than are European women. HR Hearing 102–42 at 63.

—Surgeon General Koop is quoted as estimating that domestic violence is the number one health problem for women. *Id.* at 64.

—Every 15 seconds a woman is beaten by a husband or boyfriend; every 6 minutes a woman is raped; and 1 in 8 adult women has been raped sometime in her lifetime. HR Hearing 103–51 at 4.

—The high rate of rape and crime deter women from taking jobs in some industries that involve night travel; they are also discouraged from using public transportation. *Id.* at 13.

—Homicide on the job is the leading cause of death for women. *Id.*

—More than one-half of all homeless women have lost housing because they are fleeing domestic violence. *Id.*

—41 State Attorneys General stated by letter dated July 22, 1993, that "the current system of dealing with violence against women is inadequate." *Id.* at 34–36. The AG's supported federal action and the GMVA. *Id.*

—50% of the labor force is women and there is a staggering loss of productivity for employees who are victims of domestic violence. *Id.* at 43.

—Domestic violence results in tardiness, poor job performance, increased medical claims, interpersonal conflicts at work, depression, stress, and substance abuse. Senate Hearing 103–596 at 16.

Testimony was also presented from two legal scholars, Burt Neuborne, New York University Law Professor, and Cass Sunstein, University of Chicago Law Professor. HR Hearing 103–51. Mr. Neuborne advised that there was ample authority for legislation under the Commerce Clause "due to the destructive impact of pervasive gender-based violence on the nation's labor market and on the performance of 50% of its work force." *Id.* at 42.

Ms. Sunstein presented a review of Commerce Clause case law to the Congress. *Id.* at 57–59. She observed that Congress would be required to have appropriate evidence and findings and gave examples of such evidence and findings. *Id.* at 60. She did not venture an opinion as to whether that actual evidence before Congress supported Commerce Clause authority, *id.* at 60, but did state "the facts before the Committee—emphasizing enormous levels of sex-related violence, and the recent increase in that form of criminality—could reasonably justify the conclusion that the interstate market is adversely affected." *Id.* at 61.

The Senate generated at least four reports based on the evidentiary hearings, and the House generated one: S.Rep. No. 101–545 (1990); S.Rep. No. 102–197 (1991); S.Rep. No. 102–118 (1992); S.Rep. No. 103–138 (1993); and H.R.Conf.Rep. No. 103–711 (1994). Each report reiterated many of the evidentiary facts and statistics that were gathered from the hearings, which showed how gender-motivated violence substantially affects the national economy and interstate commerce.

S.Rep. No. 101–545 (1990) concludes that: costs to the individual and society of gender-motivated violence are staggering and include medical costs, law enforcement, lost careers, decreased productivity, lost educational opportunities and long-term health problems (at 33); negative attitudes toward crime against women are present in the criminal justice system (at 34); violence takes a toll on jobs due to absenteeism and sick time (at 37); and assaults motivated by gender are violations of civil rights and a form of discrimination. At 40.

Congress's power to remedy this kind of discrimination stems from the same constitutional sources that underpin other anti-discriminatory legislation: the commerce clause, the fourteenth amendment, the right to travel, and other rights protected by the privileges and immunities clause. Gender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases

health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy. Gender-based crimes and women's fears of these crimes also restrict the enjoyment of federally protected rights like the right to employment, the right to public accommodations, and the right to travel. Finally, gender-based crimes violate our most fundamental notion of equality—that no person's physical security should be at risk because of an immutable trait, because of race, religion or gender.

At 43.

S.Rep. No. 102–197 (1991) concludes that the legislation is necessary to show a consensus that the violence will not be tolerated (p. 35); violence motivated by gender is discrimination (at 49); state remedies are inadequate to fight bias crimes (at 41); crimes motivated by gender are hate crimes (at 43); and that local prejudices, legal barriers and disbelief of women victims argue for a federal not state remedy (at 48).

Gender-based violence meets the modest threshold required by the Commerce Clause. Gender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy. Gender-based violence bars its most likely targets—women—from full participation in the national economy. For example, studies report that almost 50% of rape victims lose their jobs or are forced to quit because of the crime's severity. Even the fear of gender-based violence affects the economy because it deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence.

At 53.

S.Rep. No. 103–138 (1993) concludes that we spend $5–10 billion in health care, criminal justice, and other social costs of domestic violence (p. 41); state laws cannot provide a national anti-discrimination standard (p. 51); "a civil rights claim redresses an assault on a commonly shared ideal of equality" (p. 51); and that the affect on the economy and inter-

state commerce is "precisely the rationale on which the Supreme Court relied in upholding the 1964 Civil Rights Act with respect to race (and presumably, sex as well)" (p. 54–55).

Finally, H.R.Conf.Rep. No. 103–711 (1994) concludes that:

[c]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce; crimes of violence motivated by gender have a substantial effect on interstate commerce, by diminishing national productivity, increasing medical and other costs, and decreasing the supply and the demand for interstate products; a Federal civil rights action as specified in this section is necessary to guarantee equal protection of the laws and to reduce the substantial effects on interstate commerce caused by crimes of violence motivated by gender; and the victims of the crimes of violence motivated by gender have a right to equal protection of the laws, including a system of justice that is unaffected by bias or discrimination.

*Id.* at 385–86.

Without doubt, the evidence before Congress revealed a significant incidence of violence against women, some of which is very likely based on gender (e.g., rape) and some of which may be based on gender (e.g., domestic violence). There was substantial evidence that the violence dramatically affects women's lives (e.g., their productivity at work) and also affects the national market by affecting the women's ability to participate in the national economy. Congress thus found that gender-based violence substantially affects interstate commerce. This Court joins almost all other District Courts which have addressed the issue in concluding that the Congressional finding has a rational basis. *Crisonino,* 985 F.Supp. at 396; *Anisimov,* 982 F.Supp. at 538; *Seaton,* 971 F.Supp. at 1194; *Doe,* 929 F.Supp. at 615.

The Defendant argues that the *Lopez* case, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d

626, and *United States v. Pappadopoulos,* 64 F.3d 522 (9th Cir.1995) demand a different conclusion.[5] The Ninth Circuit, however, in evaluating the *Lopez* case has stated that "[t]he Supreme Court based its ruling on a lack of any necessary connection, or of legislative findings of such a connection, between gun possession in a school zone and interstate commerce." *United States v. Houser,* 130 F.3d 867, 872 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2074, 141 L.Ed.2d 150 (1998). In the case of the GMVA, however, there are significant legislative findings of the connection between gender-based violence and interstate commerce. When the Ninth Circuit evaluated the Controlled Substances Act on a Commerce Clause challenge, the Court found that the "presence of Congressional findings in support of the Controlled Substances Act distinguishes this case from the situation presented to the Court in *Lopez.*" *United States v. Tisor,* 96 F.3d 370, 374 (9th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1012, 136 L.Ed.2d 889 (1997). This case is distinguishable from the *Lopez* case, for the same reason.

The Ninth Circuit has also commented that the Supreme Court saw the Gun–Free School Zone Act as a " 'sharp break with the long-standing pattern of federal firearms legislation.' " *Henson,* 123 F.3d at 1232, *quoting Lopez,* 514 U.S. at 562, 115 S.Ct. 1624. The statute at issue in *Lopez* was a criminal statute with criminal law being an area of historic state regulation. Although the Defendant characterizes the GMVA as dealing with state family law issues, that belies the plain language of the statute and Congressional intent. The legislation is civil rights legislation, an area of historic federal action. *Crisonino,* 985 F.Supp. at 397; *Anisimov,* 982 F.Supp. at 540. The GMVA has as its purpose

> To protect the civil rights of victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce by establishing a Federal civil rights cause of action for victims of crimes of violence motivated by gender.

42 U.S.C.S. § 13981(a) (1997). Congress explained that the GMVA's civil rights provision "makes a natural commitment to condemn crimes motivated by gender in just the same way that we have made a national commitment to condemn crimes motivated by race or religion. It provides a civil rights remedy in the tradition of sections 1981, 1983, and 1985(3)." S.REP. No. 101–545, at 41 (1990).

A civil rights remedy is recognized as distinct from that of a criminal conviction or a civil remedy for a tort. Criminal convictions vindicate the state interest in protecting its citizens while a civil tort addresses personal injury. A civil rights claim by contrast addresses equality, a victim's interest in equal treatment. S.REP. No. 101–545 at 42 (1990); S.REP. No. 103–138 at 50 (1993).

The Supreme Court has consistently upheld civil rights legislation under Congress' Commerce Clause power. *See EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (Age Discrimination in Employment Act is valid exercise of Congress' power under Commerce Clause on its face and as applied); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (Congress acted within its Commerce Clause power to protect and foster commerce in extending coverage of the Civil Rights Act of 1964 to restaurant serving food which had traveled in interstate commerce); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (Title II of Civil Rights Act of 1964 is a valid exercise of Congress' power under the Commerce Clause as applied to a place of public accommodations serving interstate travelers).

The GMVA is unlike the statute at issue in *Lopez,* not only because there were Congres-

---

5. *Pappadopoulos* is of little assistance as the case is not on point. The federal statute at issue there made arson of property used in interstate commerce a federal crime. 18 U.S.C. § 844(i). The statute had a jurisdictional element, which is not the case in the GMVA, and dealt with a crime traditionally under state control. The only tie to interstate commerce was that the private residence burned received natural gas from out of state. The court held that this was insufficient to confer federal jurisdiction. *Pappadopoulos,* 64 F.3d at 528.

sional findings supporting it where none existed in *Lopez*, and because it is civil rights legislation, an area of national concern, not criminal law, but also because it defers to state definitions for crimes of violence, 42 U.S.C. § 13981(d)(2) (1997). It also specifically excludes jurisdiction over the traditional areas of state control of "divorce, alimony, equitable distribution of marital property, [and] child custody decree[s]." 42 U.S.C. § 13981(e)(4) (1997).

The Defendant also argues that Congress only found an effect on the national economy which is distinct from an effect on interstate commerce, and that effects on the national economy were rejected as a basis for the legislation in *Lopez*. This argument was addressed by the court in *Crisonino*, 985 F.Supp. at 396 n. 15. There, the court cited *New York v. United States*, 505 U.S. 144, 158, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) for the proposition that activities that affect the national economy are within Congress's power to regulate under the Commerce Clause. *Id.* The court in *Seaton* also discounted the argument, noting that the national economy and interstate commerce are both inevitably affected by gender-based crime. *Seaton*, 971 F.Supp. at 1194. This Court concludes that by finding a significant effect on the national economy of gender-based violence, Congress implicitly (and explicitly) found an effect on interstate commerce as well.

Finally, Defendant argues that the evidence before the Congress had no empirical base, is political rhetoric, and is not valid or reliable. Therefore, he argues, Congress could not have rationally concluded that gender-motivated violence affects interstate commerce. The argument misses the mark. It is at best an indictment of the process by which Congress gathers evidence prior to enacting legislation. The method by which Congress reaches a decision, however, is, as a general matter, for Congress to determine. *City of Boerne*, 117 S.Ct. at 2170. Here the Court is not performing a *de novo* review, investigating the accuracy of the evidence before Congress, or applying the Federal Rules of Evidence to the evidence. The Court must instead determine if, given the evidence

Congress had before it, Congress could have rationally determined that gender-motivated violence substantially affects interstate commerce. As previously stated, under that standard, with deference being given to the statute's constitutionality and to the legislative findings, the Court finds that there is a rational basis for a Congressional finding that gender-motivated violence affects interstate commerce.

**(b) Is the GMWA reasonably adapted to a permissible end?**

 Having determined that a rational basis exists for Congress' finding that gender-based violence substantially affects interstate commerce, the Court must next determine whether the GMVA is reasonably adapted to achieve a constitutionally permissible end. *Hodel*, 452 U.S. at 276, 101 S.Ct. 2352. Here, Congress had determined that state laws were inadequate to protect against gender-motivated violence and followed "the well-worn course of enacting legislation designed to protect civil rights inadequately safeguarded by the states." *Anisimov*, 982 F.Supp. at 540. The statute supplements state and federal criminal law and state tort law to address the inadequacies. The GMVA allows a person to obtain relief for a civil rights violation for him/herself. By acting as a private attorney general, the person also vindicates a Congressional policy of significant importance. *Doe*, 929 F.Supp. at 616 citing *City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). The Court concludes that the statutory scheme is reasonably adapted to meet its goal which is an end permitted by the Constitution. *Crisonino*, 985 F.Supp. at 396; *Anisimov*, 982 F.Supp. at 539–40; *Seaton*, 971 F.Supp. at 1194 (the test is not whether Congress could have drafted a better law); *Doe*, 929 F.Supp. at 617.

**(c) Is a jurisdictional element required in the GMVA?**

 Defendant argues that the GMVA, like the statute at issue in *Lopez*, does not have a jurisdictional requirement limiting each individual case under the statute to situations involving interstate commerce.

The Defendant concedes a jurisdictional element is not required. This Court likewise concludes no jurisdictional element is required in the GMVA. If a jurisdictional element was required, the *Lopez* Court would not have assessed whether the regulated activity had a substantial effect on interstate commerce, it could have merely relied on the lack of a jurisdictional element. Furthermore, a number of circuits have concluded that a jurisdictional element is not required in a statute enacted pursuant to the Commerce Clause. *United States v. Wright,* 117 F.3d 1265, 1269 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 584, 139 L.Ed.2d 422 (1997), *vacated on other grounds,* 133 F.3d 1412 (11th Cir.1998), *(petition for cert filed* 7/13/98); *see United States v. Genao,* 79 F.3d 1333, 1335–36 (2nd Cir. 1996); *United States v. Wilson,* 73 F.3d 675, 685–86 (7th Cir.1995), *cert. denied sub nom. Skott v. United States,* —— U.S. ——, 117 S.Ct. 46, 136 L.Ed.2d 12 (1996).

## IV. CONSTITUTIONALITY OF THE GMVA UNDER THE EQUAL PROTECTION CLAUSE

When Congress enacted the GMVA, it claimed authority to do so not only under the Commerce Clause, but also under § 5 of the Fourteenth Amendment to the Constitution. 42 U.S.C.S. § 13981(a) (1997). Because this Court has found the statute to be a constitutional exercise of Congress' authority under the Commerce Clause, it need not reach the question of whether the GMVA is likewise constitutional under § 5 of the Fourteenth Amendment. *Crisonino,* 985 F.Supp. at 394 n. 13; *Anisimov,* 982 F.Supp. at 540; *Seaton,* 971 F.Supp. at 1190 n. 1; *Doe,* 929 F.Supp. at 612 n. 5.

## V. CONSTITUTIONALITY OF THE GMVA AS APPLIED

Defendant also asserts that the GMVA is unconstitutional as applied in this case because (1) it is extending a federal cause of action in an area of traditional state control, i.e., family law and (2) it violates the Equal Protection Clause of the Fifth Amendment because it contains a gender-based classification that fails to serve important government objectives and is not substantially related to those objectives.

### (a) Is it constitutional for the GMVA to be extended to domestic violence?

 The GMVA is a civil rights statute and by its own terms cannot give the federal court jurisdiction over "divorce, alimony, equitable distribution of marital property, or child custody decree." 42 U.S.C.S. § 13981(e)(4) (1997). Thus, even as applied in this case, the GMVA is not usurping state court jurisdiction because the civil rights cause of action does not fall within the state's domestic relations laws.

It is true as Defendant asserts, that under Washington State laws, a history of domestic violence can have significant effects on child custody. R.C.W. 26.09.191 limits a parent's residential time with a child if it is found that a parent has engaged in a history of acts of domestic violence as defined in R.C.W. 26.50.010(1). WASH.REV.CODE § 26.09.191(2)(a)(iii) (1997). In addition, mutual parental decision making is statutorily precluded upon a finding of a history of acts of domestic violence. WASH.REV.CODE § 26.09.191(1)(c) (1997). It does not follow from the fact that success in this suit may be helpful to the Plaintiff and detrimental to the Defendant that the GMVA is unconstitutional as applied. This issue of leverage in state court actions was discussed by Congress in Senate Report 102–197. This Court agrees with the Report which states that there was no reason to assume women would file false and vindictive civil rights claims for ulterior motives and if they did sanctions exist. *Id.* at 48. In sum, it is this Court's conclusion that the GMVA is constitutional as applied to this domestic violence claim.

### (b) Is the Equal Protection Clause Violated as the GMVA is Applied in this Case?

Defendant asserts that the GMVA violates the equal protection provision of the Fifth Amendment because of its gender-based classification. Plaintiff, NOW and the United States argue that the statute is gender-neutral, and because it does not establish a

gender classification system, it is not even subject to equal protection scrutiny.

### (1) *Does the Defendant have standing to raise the equal protection issue?*

The United States asserts that the Defendant has no standing to raise the equal protection issue because he has not even alleged that he has suffered some actual or threatened injury. Under Article III, § 2 of the Constitution, federal courts have jurisdiction over an issue only if it is a "case" or "controversy." This is a "bedrock requirement." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). One element of the case-or-controversy requirement is that the litigant must establish that he/she has standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The inquiry regarding standing focuses on whether the litigant is the proper party to bring the suit. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

To meet the standing requirement of Article III, Supreme Court cases have established three elements. First, the litigant must allege that he/she has suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore*, 495 U.S. at 155, 110 S.Ct. 1717 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon*, 426 U.S. at 41–42, 96 S.Ct. 1917. Third, it must be likely, as opposed to merely speculative, that the injury will be "redressed by a favorable decision." *Id.* at 38, 96 S.Ct. 1917. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197.

Here, the Defendant has not yet filed an answer to the Complaint with a cross claim under the GMVA, alleging he was a victim of gender-motivated violence at the hands of the Plaintiff.[6] It appears the United States is correct that until the Defendant makes a claim of injury in fact against the Plaintiff, he has no standing to raise the issue. Even if the Defendant had standing to raise the issue, his assertion that the statute violates his Fifth Amendment right is without merit and will be addressed *infra*.

### (2) *Does the GMVA contain a gender classification?*

 Defendant first argues that the title of the Act clearly establishes a gender classification. The Violence Against Women Act of 1994 is the short title for a number of provisions. 108 Stat.1902, Part 3 (1995). The short title for the provision of the Act at issue here, Sub–Title C, is Civil Rights Remedies for Gender–Motivated Violence Act. *Id.* at 1941. Thus the specific title refers to gender, not women. But even the reference to women in the overall title may not be used to create an ambiguity where the body of the act itself is clear because the title cannot overcome the plain meaning of the words of the statute. *United States v. Minker*, 350 U.S. 179, 185, 76 S.Ct. 281, 100 L.Ed. 185 (1956); *Pike v. United States*, 340 F.2d 487, 489 (9th Cir.1965). Here the body of Sub–Title C of the GMVA refers only to gender, not women and the plain meaning of the words is that gender-motivated violence is proscribed, not just violence against women. Defendant admits moreover that the statutory language itself is gender-neutral.

Defendant's second assertion in support of the argument that there is a gender classification in the GMVA is that the focus of the

---

**6.** Plaintiff concedes that the Defendant has a federal constitutional right equal to the Plaintiff's to bring a GMVA civil rights claim, though Plaintiff disputes whether the facts would support Defendant's claim. Plaintiffs' Memorandum filed 3/30/98, p. 38 lines 16–17.

testimony before Congress and the Congressional findings were on women. While violence against women received most of the testimony and attention of Congress, there was testimony that there are male victims of gender-based crime as well, where the male may be selected because of his sex. Sen. Hearing 101–939, p. 62. The testimony was that while their numbers are few "they need and deserve the same legal protection as female victims." *Id.* In addition, Congress recognized that a man could be a victim of gender-motivated violence when it discussed the proof needed to show gender motivation. SEN.REP. No. 103–138, at 52 (1993). The Senate gave as an example that an attacker could shout anti-woman or anti-man epithets during an assault. *Id.*

Defendant finally argues that "constitutionality under the Commerce Clause would completely disappear for men if they attempted to avail themselves of the statute" because there are no legislative findings to support violence against men as a problem. Defendant's Memorandum, filed 2/18/98, pp. 30–31. There is no support for Defendant's position that a statute is unconstitutional as applied if the statute is used by individuals who are not designed to be its primary beneficiaries. In fact, statutes prohibiting discrimination are frequently used by such individuals. *Oncale v. Sundowner Offshore Services,* 523 U.S. 75, ——, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (although male-on-male sexual harassment was not the principle evil Congress was concerned with when it enacted Title VII, the Title still covers this form of sexual harassment). The Court concludes that the GMVA does not contain a gender classification, but is in fact gender-neutral.[7]

 Absent a facial gender-based classification, a statute can only be struck down if it has a discriminatory purpose or a history of discriminatory application. *See Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 273–75, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (facially gender-neutral statute allowing state hiring preference for veterans did not offend equal protection because it was not enacted for the purpose of discriminating against women); *Yick Wo v. Hopkins,* 118 U.S. 356, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (an ordinance requiring laundries to be in brick or stone buildings was enforced only against Chinese laundry owners; the facially neutral statute was found to be in violation of the Fourteenth Amendment due to its discriminatory application). Here, the Defendant does not argue that there has been a history of discriminatory application of the statute, but only implicitly argues that the GMVA has a discriminatory purpose against men.

In assessing whether the statute purposely discriminates against men, the Court may consider whether there is an adverse impact by the GMVA on men. *Feeney,* 442 U.S. at 274, 99 S.Ct. 2282. In *Feeney,* the state statute at issue offered a hiring preference for veterans. While admitting that more veterans are men than women, the Court also observed that the non-veteran class contained a large number of men as well as women. The Court said that too many men were also "affected" by the statute (unable to benefit from the statutory preference) "to permit an inference that the statute is but a pretext for preferring men over women." *Id.* at 275, 99 S.Ct. 2282. Similarly here, it is recognized that most victims of gender-motivated violence are women, but some are men. The non-victim class includes too many women also "affected" by the statute, i.e., unable to bring a suit under the GMVA, to infer that the statute is a pretext for favoring women over men.

A discriminatory purpose for a statute may also be found if the statute seeks to keep the affected class in a stereotypic role. *Id.* at 279, 99 S.Ct. 2282. Here, the statute does not seek to keep men or women in stereotypic roles. The legislative history does not suggest that all men are prone to gender-motivated violence or that women are victims because they are inherently weak or inferior. In fact, the statute attempts to dispel any stereotype that exists that gender-motivated

---

7. Because the Court does not find that a gender-based classification exists in the GMVA, the Court need not address Defendant's argument that the classification fails to serve important governmental objectives and it is not substantially related to those objections.

violence is acceptable or will be tolerated by the society. S.REP. 120–197, at 35 (1991). The Court concludes that the statute does not have a discriminatory purpose and does not violate the Equal Protection Clause as applied in this case.

## VI. STATE LAW ISSUES

Defendant argues that all state law claims should be dismissed because they are not within the applicable statutes of limitation; that Luke Ziegler and Journee Ziegler do not have standing to assert a claim of outrage; that the tort of domestic violence must be dismissed because it is not a cause of action in Washington State; and that the Court should decline supplemental jurisdiction over any state claims.

### (a) Are the state claims within the applicable statutes of limitation?

Defendant argues that all state tort actions alleged by the Plaintiff have a two year statute of limitations; that the parties separated in December, 1995, and the lawsuit was filed more than two years later, therefore "[t]he actions should be dismissed on this ground alone." Defendant's Memorandum filed 2/18/98, pp. 39–40. The Plaintiff's state law claims include (1) assault; (2) battery; (3) outrage; (4) defamation; (5) malicious harassment; and (6) the tort of domestic violence. The Complaint was filed December 1, 1997 (Ct.Rec.1).

▇▇▇▇ ***Assault and Battery.*** Assault is committed when a person's actions or threats cause a victim apprehension of imminent physical violence. *St. Michelle v. Robinson,* 52 Wash.App. 309, 313, 759 P.2d 467 (1988). The common law definition of assault also includes unlawful touching with criminal intent or actual battery. *State v. Wilson,* 125 Wash.2d 212, 217–18, 883 P.2d 320 (1994). A two year statute of limitation applies to claims of assault and battery. WASH.REV. CODE ANN. § 4.16.100(1) (1988). Alleged actions must have occurred since December 1, 1995 to satisfy this statute of limitations.

There is no allegation within the statute of limitations of actual battery. On or about December 4, 1995, however, the Defendant

communicated to the Plaintiff he was waiting for her at home with a loaded shotgun. Amended Compl. filed 3/30/98, ¶ 50. The alleged conduct is within the two year statute of limitations.

▇▇▇▇ ***Outrage.*** The elements of the tort of outrage are (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. *Dicomes v. State,* 113 Wash.2d 612, 630, 782 P.2d 1002 (1989). The conduct must be outrageous, go beyond all bounds of decency, and be regarded as atrocious or intolerable in a civilized community. *Id.* The law is unsettled in the State of Washington as to the applicable statute of limitations. *Doe v. Finch,* 133 Wash.2d 96, 100, 942 P.2d 359 (1997) (one prior case has applied a three year statute of limitations and another *in dicta* observed that the statute of limitations was two years).

▇▇▇▇ Plaintiff appears to accept a two year statute of limitations. She asserts that post separation the Defendant routinely told Plaintiff he was stalking her and knew of her every move; Defendant followed her and hired others to do so; Amended Compl. ¶ 52; Defendant told her employer that Plaintiff had mental problems, *id.* at ¶ 54; and spent over $100,000 in the custody battle deposing even casual acquaintances of the Plaintiff. *Id.* at ¶ 56. Since the marital separation occurred in December, 1995, and these actions occurred after that time, the claim of outrage is within the two year statute of limitations.

▇▇▇▇ ***Defamation.*** The four elements of a *prima facie* case of defamation are: "falsity, an unprivileged communication, fault, and damages." *LaMon v. Butler,* 112 Wash.2d 193, 197, 770 P.2d 1027 (1989). The statute of limitations on a defamation claim is two years. WASH.REV.CODE ANN. § 4.16.100(1) (1988); *Albright v. State,* 65 Wash.App. 763, 769 n. 3, 829 P.2d 1114 (1992).

Here the Complaint alleges that the Defendant, on June 20, 1996, wrote a letter to Plaintiff's employer alleging that the Plaintiff had a history of mental health problems.

Amended Compl. ¶ 54. More generally, the Plaintiff also alleges that the Defendant made highly defamatory statements which he knew were false regarding her to her friends, co-workers and supervisors which has disrupted her job. Amended Compl. ¶¶ 53, 55, 57. The allegations are of conduct occurring within the statute of limitations.

 *Malicious Harassment.* Washington state law recognizes the availability of a civil tort action for malicious harassment which mirrors the elements of the criminal action for malicious harassment found at R.C.W. 9A.36.080. WASH.REV.CODE ANN. § 9A.36.083 (1998 Supp.). Malicious harassment includes the malicious and intentional infliction of physical injury or threats of harm which leave a person in reasonable fear of harm and which is motivated by the perpetrator's perception of the victim's gender. WASH.REV.CODE ANN . § 9A.36.080(1)(a) and (c) (1998 Supp.). The factors to consider in determining whether an act of violence is gender motivated include "[a]ffirmative indications of hatred towards gender as a class" along with specific perpetrator conduct which might include "use of language, slurs, or symbols expressing hatred towards the victim's gender", injury to the victim's sexual organs, "a history of similar incidents in the same area," lack of provocation or other apparent motivation and "common sense." WASH.REV.CODE ANN. § 9A.36.078 (1998 Supp.). There is no specific statute of limitations for the action so it appears to fall within the three year statute of limitations established by R.C.W.A. 4.16.080(2) ("any other injury to the person or rights of another not hereinafter enumerated"). WASH.REV.CODE ANN. § 4.16.080(2) (1998 Supp.). Thus actions after December 1, 1994 would be within the statute of limitations.

Here is it alleged:

1. Defendant threatened to kill the Plaintiff, her children and himself in the year prior to their separation on December 4, 1995. Amended Compl. ¶¶ 31, 32;

2. Defendant attempted to run over Plaintiff with his Suburban on August 11, 1995, Amended Compl. ¶ 21; and

3. Defendant hit Plaintiff on her back causing her to fall on October 31, 1995. Amended Compl. ¶ 23.

In addition, Plaintiff alleges that the conduct constituting assault and the tort of outrage also is malicious harassment. The Defendant's alleged actions fall within the three year statute of limitations. The Court concludes that the claims of assault, outrage, defamation and malicious harassment are within the applicable statute of limitation.

**(b) May Luke Ziegler and Journee Ziegler assert a claim of outrage?**

Defendant asserts that the claims filed by Luke Ziegler and Journee Ziegler should be dismissed because they have no standing. Plaintiff asserts that 28 U.S.C. § 1367(a) gives the Court supplemental jurisdiction over Luke and Journee's claim.

 The supplemental jurisdiction statute provides that supplemental jurisdiction "shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C.S. § 1367(a) (1998 Supp.). Thus where plaintiff A has a federal and state law claims against a defendant, claims by plaintiff B against the same defendant, where there is no original federal jurisdiction, may be retained by the federal court provided the claims of plaintiff B arise out of the same set of facts, occurrences, witnesses and evidence as plaintiff A's claims. *Palmer v. Hospital Authority of Randolph County,* 22 F.3d 1559, 1567 (11th Cir.1994); *see also McCray v. Holt,* 777 F.Supp. 945, 947–48 (S.D.Fla.1991).

The Court has supplemental jurisdiction over the claims of Luke Ziegler and Journee Ziegler because the claims arise out of the same case or controversy as is presented by Michelle Ziegler's federal cause of action and her state claims. They are proper additional parties.

 Defendant also argues that any claims of outrage are outside the statute of limitations of two years. Luke and Journee are mentioned as witnesses of the abuse of their mother in the Amended Complaint ¶¶ 16, 19, 20(b), (c), (e) and (g), 30 and 75. Little of the conduct is alleged to have occurred on specific dates, but the conduct in

¶ 19 occurred during Michelle Ziegler's pregnancy; ¶ 30 occurred when Luke was ten years old; and ¶ 20(g) occurred in 1992. Because Luke and Journee were under the age of 18 at the time the conduct occurred, the statute of limitations would be tolled until they reached the age of 18. WASH.REV.CODE ANN. § 4.16.190 (1998 Supp.). At this stage of the proceeding, the Court will not dismiss on the basis of a statute of limitation argument. There may be allegations of conduct which can be proven to have occurred within the statute of limitations.

**(c) Does the tort of domestic violence exist as a cause of action in Washington State?**

The parties dispute whether the tort of domestic violence exists as a cause of action in Washington State, and if it does what the applicable statute of limitations would be for the claim. Plaintiff asserts that the on-going pattern of violence should be deemed a continuing tort and/or that the statute of limitations should be tolled due to incapacitation, disability or duress; and that the Defendant is estopped from asserting a statute of limitations defense. The Court will reserve ruling on these issues as they are inextricably intertwined with Plaintiff's Motion for Certification to the Washington State Supreme Court filed March 26, 1998 (Ct.Rec.16).

**(d) Should the Court maintain supplemental jurisdiction over the state law claims?**

The Defendant argues that the Court should decline to exercise its supplemental jurisdiction over the state law claims because the Plaintiff is attempting to gain leverage in her state child custody case and divorce action. Plaintiff asserts that the Court should exercise its discretion and maintain jurisdiction over the supplemental state law claims out of a concern for judicial economy and fairness.

*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and the subsequently enacted statute on supplemental jurisdiction, 28 U.S.C. § 1367(a), set out the Court's proper considerations on the question of supplemental jurisdiction over the state claims. In *Gibbs*, the Court authorized federal courts to assert jurisdiction over state law claims when "[t]he state and federal claims ... derive from a common nucleus of operative fact," the claims are such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding," and the federal issues are substantial. *Gibbs*, 383 U.S. at 724, 86 S.Ct. 1130. The Court also advised that the district court could exercise its discretion and decline jurisdiction after considering concerns of judicial economy, convenience, fairness, and comity. *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. The concept of supplemental jurisdiction was codified in 1990 in 28 U.S.C. § 1367. This statute provides that:

> in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case and controversy....

28 U.S.C.S. § 1367(a) (1998 Supp.).

There is no question here that the federal and state law claims form a part of the same case and controversy and that this Court has supplemental jurisdiction over the state law claims. The question is whether supplemental jurisdiction should be declined.

The statute also provides that:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

> (1) The claim raises a novel or complex issue of State law,

> (2) The claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> (3) The district court has dismissed all claims over which it has original jurisdiction, or

> (4) In exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.S. § 1367(c) (1998 Supp.).

The Ninth Circuit in *Executive Software North America v. United States District Court for Central Dist. of California*, 24 F.3d

1545 (9th Cir.1994) examined the supplemental jurisdiction statute and held that if a court has supplemental jurisdiction, it must exercise that jurisdiction unless one of the four 1367(c) conditions are satisfied. *Executive Software*, 24 F.3d at 1555–56. The court observed that 1367(c)(4) was reserved for exceptional circumstances that are "quite unusual." *Id.* at 1558. Only the first factor appears present in this case, as the state claims may present novel and complex questions of state law.

If the court determines that one of the conditions is satisfied, the court must still exercise its discretion by considering whether remanding the pendent state law claims would comport with the underlying objectives of judicial economy, convenience, fairness and comity. *Id.* at 1557; *Smith v. K–Mart Corp.*, 899 F.Supp. 503, 505 (E.D.Wash.1995). Convenience to the parties and fairness favor this Court retaining jurisdiction over the state law claims. Judicial economy would also favor this Court exercising its supplemental jurisdiction over the claims. Comity considerations might favor allowing the state courts in the first instance to address any novel or complex questions of state law. However, the mechanism for the Court to certify questions to the Washington State Supreme Court should address comity considerations if this Court maintains supplemental jurisdiction. Therefore, the Court determines that the underlying objectives of the supplemental jurisdiction statute will best be met by the Court exercising supplemental jurisdiction over the state law claims.

## VII. CONCLUSION

In summary, the Court has determined that:

1. Plaintiff has stated a claim under the GMVA, 42 U.S.C. § 13981;

2. The GMVA is a constitutional exercise of the Congress' authority under the Commerce Clause;

3. The GMVA is constitutional as applied in this case to domestic violence and there is no Equal Protection Clause violation;

4. The state law claims of assault, outrage, defamation, and malicious harassment are within the applicable statutes of limitation;

5. Plaintiffs Luke Ziegler and Journee Ziegler may assert a claim of outrage;

6. This Court shall maintain supplemental jurisdiction over the state law claims; and

7. The Court will reserve ruling on the questions of whether the tort of domestic violence exists as a cause of action in Washington and, if it does, what the applicable statute of limitations is; whether the ongoing pattern of domestic violence should be treated as a continuing tort for any or all state claims; whether the Defendant is estopped from asserting a statute of limitations defense on any or all state claims; and whether the statute of limitations should be tolled due to incapacitation, disability and/or duress on any or all state claims. Accordingly,

**IT IS ORDERED** that:

1. The Defendant's Motion for Dismissal of Claim filed February 18, 1998, **Ct.Rec. 6**, is **DENIED IN PART**, as set forth in VII. Conclusion, ¶¶ 1–6, and the Court **RESERVES RULING IN PART** as set forth in VII. Conclusion, ¶ 7.

2. The Defendant shall file his answer in compliance with Fed.R.Civ.P.Rule 12(a)(4)(A) **within ten days after receipt of this Order.**

3. Following the filing and service of Defendant's answer, the parties will receive notification scheduling a status conference in this matter from the Courtroom Deputy. At the conference, the Court will set a hearing date on Plaintiffs' Motion for Certification (Ct.Rec.16).

The District Court Executive is directed to file this Order and provide copies to counsel.

## ORDER

Before the Court for hearing without oral argument on November 5, 1998, is Defendant's Motion to Reconsider (Ct.Rec.66) presented by Mary Schultz. The Court has reviewed the file, the Defendant's Motion, the United States' Opposition to Defendant's Motion presented by Marcia Sowles, the Plaintiffs' Response to Defendant's Motion to

Reconsider presented by Richard Eymann, and Defendant's Reply. For the reasons stated below, the Motion for Reconsideration is denied.

## BACKGROUND

By an Order filed September 24, 1998 (Ct. Rec.65), this Court determined *inter alia* that the Gender–Motivated Violence Act [GMVA], 42 U.S.C. § 13981 was a constitutional exercise of the Congress' authority under the Commerce Clause. The Court also found the statute was constitutional as applied to this case of domestic violence and did not violate the Equal Protection Clause of the Fifth Amendment. The Court declined to reach the question of whether the GMVA was an unconstitutional exercise of Congress' authority under Section 5 of the Fourteenth Amendment. Order, Ct.Rec. 65, p. 23.

Defendant filed the Motion to Reconsider pursuant to Fed.R.Civ.P. 59(e) on the single ground that the Court must either reach the question of whether the GMVA is "repugnant to" the Constitution under Section 5 of the Fourteenth Amendment or must grant Defendant leave to file this challenge again.

## MOTION TO RECONSIDER

Under the Federal Rules of Civil Procedure, motions for reconsideration may be made pursuant to Rule 59(e). The major grounds for granting a motion to reconsider a judgment are: (1) intervening change of controlling law; (2) availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. *School District No. 1J, Multnomah County Oregon v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir. 1993). A motion for reconsideration is not appropriately brought to present arguments already considered by the Court. *Backlund v. Barnhart,* 778 F.2d 1386, 1388 (9th Cir. 1985). Defendant does not argue that there has been a change of controlling law, or that new evidence is available, but implicitly argues that the Court committed clear error.

While Defendant attempts to frame the issue as whether the GMVA is repugnant to Section 5 of the Fourteenth Amendment, that is not the claim that was before the Court. Defendant's Motion to Dismiss asserted that Congress did not have the authority to enact the GMVA under either of the powers the statute identified: the Commerce Clause or Section 5 of the Fourteenth Amendment. The Defendant also raised claims that the GMVA was unconstitutional as applied to domestic violence and violated the Equal Protection Clause of the Fifth Amendment.

The Court had authority to decline to rule on whether Congress had the power to enact the GMVA under Section 5 of the Fourteenth Amendment. The Court exercised judicial restraint to decide no more than was necessary. Other courts faced with the identical challenges to Congress' power to enact the GMVA have acted with the same restraint. *See* Order, Ct.Rec. 65, p. 23 listing cases. Moreover, the Supreme Court, the Ninth Circuit as well as other circuits, and district courts have consistently exercised the same restraint when faced with similar challenges to other statutes. *EEOC v. Wyoming,* 460 U.S. 226, 243, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (challenge to Congress' authority to enact the Age Discrimination Employment Act [ADEA]; having found Congress possessed the power under the Commerce Clause to enact the ADEA, the court held that it "need not decide whether it could also be upheld as an exercise of Congress' power under Section 5 of the Fourteenth Amendment"); *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 249–50, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (challenge to Congress' authority to enact Title II of the Civil Rights Act of 1964; having found Congress possessed the power under the Commerce Clause to enact the legislation, the court held that there was no need to consider any other basis (Section 5 of the Fourteenth Amendment)); *United States v. Bramble,* 103 F.3d 1475, 1480 (9th Cir.1996) (challenge to Congress' authority to enact the Migratory Bird Treaty Act [MBTA] and the Eagle Protection Act; the court held that the MBTA was constitutional under Article I, Section 8, Necessary and Proper Clause, and the Article II treaty-making power, and therefore did not consider whether it was a constitutional exercise of Congress' Commerce Clause power as

well; held the Eagle Protection Act was a constitutional exercise of Congress' power under the Commerce Clause); *Cheffer v. Reno,* 55 F.3d 1517, 1519, 1521 n. 7 (11th Cir.1995) (challenge to Congress' authority to enact the Freedom of Access to Clinic Entrances Act of 1994 [FACE]; after determining Congress had the power to enact the statute under the Commerce Clause, the court found it unnecessary to decide whether Congress also could enact the statute under Section 5 of the Fourteenth Amendment); *United States v. White,* 893 F.Supp. 1423, 1434 (C.D.Cal.1995) (challenge to Congress' authority to enact FACE; having found the statute to be a valid exercise of Congress' authority under the Commerce Clause, the court held it need not reach the issue of Congressional authority under Section 5 of the Fourteenth Amendment).

Defendant's assertion that the Court must reach the alternative basis for Congressional authority to enact the GMVA is totally unfounded. Equally unfounded is the Defendant's assertion that the GMVA is "void regardless of its validity under the Commerce Clause". Defendant's Motion to Reconsider at p. 6. Even a cursory review of the above cited cases reveals the lack of merit to Defendant's argument. The Defendant has failed to appreciate the distinction between his challenges to Congress' constitutional authority to enact the GMVA and his constitutional challenges to the substance of the Act. Congress needs only one valid constitutional basis for its legislation. Alternative bases need not be addressed when Congress' constitutional authority to enact a statute is challenged.

When constitutional challenges to the substance of a statute are made, the Court is cognizant of its duty to address all constitutional questions necessary to the disposition of the case. *Marbury v. Madison,* 5 (1 Cranch) U.S. 137, 177, 2 L.Ed. 60 (1803). Despite Defendant's assertions to the contrary, this Court did address all necessary constitutional challenges. Just as the court in *Heart of Atlanta* addressed constitutional challenges to the substance of Title II of the Civil Rights Act of 1964 as violating the Fifth Amendment Due Process Clause and the Thirteenth Amendment prohibition against involuntary servitude, *Heart of Atlanta,* 379 U.S. at 258–61, 85 S.Ct. 348, this Court addressed Defendant's challenges to the substance of the GMVA as violating the Fifth Amendment and also addressed the challenge that the statute was unconstitutional as applied to a case of domestic violence.

Finally, the Defendant states that the Court must grant leave to the Defendant to again file his challenge under Section 5 of the Fourteenth Amendment because the Court would then be required to reach the issue. The Defendant is in error. Joinder or lack of joinder of the challenges is irrelevant. A decision on the issue of whether the Congress had authority to enact the GMVA under Section 5 of the Fourteenth Amendment is unnecessary as the Court determined that Congress had the authority to enact the statute under the Commerce Clause. Thus, the Court must deny the Defendant's request for leave to refile his challenge. Accordingly,

**IT IS ORDERED** that:

1. The Defendant's Motion to Reconsider, **Ct.Rec. 66,** is **DENIED.**

2. The Defendant's Request for Leave to Refile his Challenge under Section 5 of the Fourteenth Amendment is **DENIED.**

3. The Courtroom Deputy shall set a status conference in this matter as soon as possible to avoid any additional unnecessary delay in the progress of this case.

The District Court Executive is directed to file this Order and provide copies to counsel.